2015 PA Super 13

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DAVID JOSEPH GONZALEZ | |
| Appellant | No. 448 MDA 2014 |

Appeal from the Judgment of Sentence December 18, 2013
In the Court of Common Pleas of Franklin County
Criminal Division at No(s): CP-28-CR-0001103-2011

BEFORE:  GANTMAN, P.J., JENKINS, J., and MUSMANNO, J.

OPINION BY JENKINS, J.:                    **FILED JANUARY 21, 2015**

David Gonzalez met K.M., a cerebral palsy patient,[1] on a Christian dating website.  On March 8, 2011, after dating for several months, they had sexual intercourse.  K.M. claimed that Gonzalez raped her; Gonzalez claimed that she consented to intercourse.  The jury believed K.M. and found Gonzalez guilty of rape,[2] aggravated indecent assault[3] and sexual assault.[4] The trial court sentenced Gonzalez to an aggregate sentence of 4-15 years' imprisonment.  Gonzalez filed a motion for post-trial relief and timely post-

---

[1] We will refer to K.M. either as "K.M." or "the victim".

[2] 18 Pa.C.S. § 3121.

[3] 18 Pa.C.S. § 3125.

[4] 18 Pa.C.S. § 3124.1.

sentence motions, all of which the trial court denied, and then a timely notice of appeal. Both Gonzalez and the trial court complied with Pa.R.A.P. 1925. For the reasons articulated below, we affirm.

Gonzalez raises six issues in this direct appeal:

> I. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE VERDICTS OF GUILT AS TO THE CRIMES OF RAPE, AGGRAVATED INDECENT ASSAULT AND SEXUAL ASSAULT[,] AS THE COMMONWEALTH FAILED TO PROVE [GONZALEZ'S] GUILT BEYOND A REASONABLE DOUBT.
>
> II. THE VERDICTS OF GUILT AS TO THE CRIMES OF RAPE, AGGRAVATED INDECENT ASSAULT AND SEXUAL ASSAULT ARE AGAINST THE WEIGHT OF THE EVIDENCE.
>
> III. THE PRETRIAL COURT ERRED WHEN IT DENIED A MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF THE AUDIO TAPE OF [K.M.'S] STATEMENT.
>
> IV. THE PRETRIAL COURT ERRED WHEN IT BARRED TESTIMONY CONCERNING THE MENTAL HEALTH DIAGNOSES OF [K.M.]
>
> V. THE TRIAL COURT ERRED WHEN IT ALLOWED THE COMMONWEALTH TO READ THE CONTENTS OF [K.M.'S] PRELIMINARY HEARING TESTIMONY.
>
> VI. THE SENTENCES IMPOSED ARE UNREASONABLE, EXCESSIVE AND NOT REFLECTIVE OF [GONZALEZ'S] CHARACTER, HISTORY AND CONDITION.

Gonzalez's first argument is a challenge to the sufficiency of the evidence. Our standard of review for such challenges is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is

sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa.Super.2003) (citations omitted).

The trial court recounts the evidence adduced at trial as follows:[5]

The above convictions arose out of an incident that occurred on March 8, 2011. The victim was twenty-five years old at the time and suffers from cerebral palsy. Her cerebral palsy causes her to have 'stiffness and tightening of the muscles' in her legs and she needs crutches to walk. She testified that if she were lying on the floor, she could pull herself up if she had something to pull herself up on. When asked whether she could bend her knees normally, she testified '[n]ot on my own. If I had to bend my knees, I would either need to use my hands or have someone to help me.' When asked if she could easily spread her legs apart, she responded, '[n]o,' and said '[t]hey have to be pushed apart.' The victim also testified that 'I can't spread my legs far

---

[5] The narrative in the trial court opinion has 73 citations to the record. For convenience, we group these citations into footnotes 6-14 below.

enough to get [a tampon] in,' and has to use pads during her period.[6]

The victim and [Gonzalez] met each other on a Christian dating website in August 2010. They met in person in September of that year, but [Gonzalez] soon left the area to pursue a position as a youth minister in New York. They reestablished a relationship when he returned in December 2010, and began seeing each other. On March 7, 2011, [Gonzalez] picked up the victim and took her to the mall. They discussed their religious beliefs, and the victim testified that 'I had told [Gonzalez] that I was a virgin and didn't plan on having sex before I was married.' She further testified that he responded by saying 'something along the lines. . .of praise the Lord.' She also said that he told her he was not a virgin. That evening, they kissed and hugged. The victim also testified that [Gonzalez] asked her to be his girlfriend, and she agreed[7].

On March 8, 2011, [Gonzalez] picked up the victim from her physical therapy appointment around 2:30 p.m. They stopped to get food and went to [Gonzalez]'s apartment to watch a movie. This was the first time the victim had been to [Gonzalez]'s apartment. They sat down on the couch and began watching the movie. The victim testified that she started kissing [Gonzalez] and they both began touching and rubbing one another's genitals over their clothes. This lasted for about half an hour. Eventually, the victim noticed that [Gonzalez] was erect. Next, the victim testified that [Gonzalez] asked her if she wanted to go to the bedroom, to which she agreed. The victim 'assumed that we would continue doing what we were doing in the living room in the bedroom. . .[b]ecause . . . [Gonzalez] knew that I didn't want to have sex

_____

[6] N.T., 9/3/13, pp. 58-62, 77.

[7] N.T., 9/3/13, pp. 64-71.

before I was married.' Before they moved, the victim testified that [Gonzalez] took her phone out of a pouch connected to her jeans and placed it on a TV tray in the living room. The victim then got her crutches, got off the couch, and walked to [Gonzalez]'s bedroom. Once in the bedroom, she noticed a bare mattress against the wall with no furniture surrounding it. [Gonzalez] then either helped her sit on the mattress or she sat down herself. The victim testified that [Gonzalez] 'took my crutches [and] put them out of reach. I didn't see exactly where he put them. But I know it was out of reach.' The victim lay down by herself. When asked 'is there any way you could have gotten up from that point?' She responded 'no.'[8]

The victim testified that [Gonzalez] then removed her jeans and underwear, and lay on top of her. The victim did not say anything while [Gonzalez] took off her pants and underwear, but when he lay on top of her, she said 'no, don't.' When he lay on top of her, her legs were flat, straight, and unopened because 'I can't open my legs by myself.'[9]

Next, the victim testified that [Gonzalez] got on his knees and forced her legs apart 'with his hands and put them on his shoulders. And he had his hands cuffed around my ankles.' She testified that '[h]e put my ankles around his shoulders.' 'He bent [her knees] because they were up on his shoulders.' She then felt his penis inside her, and she 'kept saying ow.' [Gonzalez] told the victim she 'had to be quiet.' The victim testified that at some point [Gonzalez] took her legs off his shoulders and put his finger in her vagina. He then put her legs back on his shoulders and penetrated her again with his penis. The victim was asked if she tried at all to kick off [Gonzalez] during the penetration. She responded, 'I

_____

[8] N.T., 9/3/13, pp. 71-79, 120-122, 132-134, 162.

[9] N.T., 9/3/13, pp. 79-82, 123.

couldn't move my legs. My legs don't move like that.' When asked if she tried to push him off, she said, '[n]o. . . because he's too big. And I was scared.'[10]

When asked how the penetration felt, the victim responded, 'It felt like someone was mutilating me with a sharp object.' At some point, [Gonzalez] suddenly stopped, and the encounter ended. There was blood on the mattress and blood on the victim's underwear after she put them back on. The victim testified that after she got dressed, [Gonzalez] said to her, 'I'm sorry. I have a weakness.'[11]

During cross-examination, defense counsel inquired into the victim's mobility. The victim attended Lancaster Bible College and when asked if she could walk around the campus independently, she responded, 'with crutches, yes.' The victim later testified on redirect that she has 'people to help me carry' books and things, and she needs assistance to open doors. Defense counsel further inquired into the victim's relationship with [Gonzalez], asking her about a Facebook post she had made on March 7, 2011 which read, 'I went out with an awesome guy tonight. I have known him since August. We've chatted off and on for months. And he officially asked me to be his girlfriend this evening. We are going out again tomorrow. And I'm in like with David Gonzalez.' Furthermore, when asked if she had any bruises from the incident the victim responded: 'No, I don't think I did.' The victim also testified that [Gonzalez] did not hit, kick, grab, push, gag, or punch her or use his fists or a weapon. Defense counsel asked why the victim and [Gonzalez] moved to the bedroom when they were already making out in the living room. The victim responded, 'there was no purpose. I didn't think I was in any danger with David. I saw him - I thought

_____

[10] N.T., 9/3/13, pp. 82-84, 125.

[11] N.T., 9/3/13, pp. 84-85, 88, 94, 133.

he was an honest person.' Defense counsel asked, 'So for the record, it never crossed your mind that at that point, you were moving to the bedroom for sex. It never crossed your mind?' The victim responded, 'No, ma'am.'[12]

Alternatively, [Gonzalez] testified that the encounter was consensual. He said that when he and the victim went out on March 7, 2011 and he confessed he was not a virgin, she told him she was not a virgin either, and was not proud of that fact. On the day of the incident, March 8, 2011, [Gonzalez] agreed that while they were in the living room, [the victim] started kissing him and he kissed her back. He also agreed that they both started touching each other intimately over their clothes, and then he 'asked [the victim] if she wanted to go to the bedroom. She agreed. [The victim] got up, and she went first. I went behind [the victim]. I followed after her. Then we went into the bedroom together.' [Gonzalez] testified about the events in the bedroom in the form of a narrative:

> We were kissing each other. . . . We stood -- we were kissing. [The victim] was still fondling my penis. . . [The victim] then sat down on the bed. [The victim] then asked me to take my pants off. She asked me — she leaned back. And she asked me to help her with her jeans. She also [asked] with her motions, as well as asking me verbally, to help her with her pants. I did that and her panties. [The victim] laid her canes on the other side of the bed flat on the bed. And so I asked [the victim] if I can— well, I was going to lay next to [the victim]. [The victim] was on one side of the bed [and] the canes were on the other side of the bed. I asked [the victim] if I can move the canes towards the right or the left. [The victim] said fine. I laid next to [the victim]. And we were

---

[12] N.T., 9/3/13, pp. 100, 108, 158-163.

kissing. [The victim], we were laying next to each other. We were kissing. [The victim] was still fondling me. [The victim] then asked me if I could rub my penis against her vagina. And I did that. While I was doing that, I was kind of—went on the side. I was basically with my hand trying to rub my penis against her vagina. After that, I moved over kind of almost on top of her. I started grinding. I started rubbing my penis without my hands. Before I was—before I did that, I did touch [the victim] with my finger while I was rubbing. [The victim] got - she got aroused. She started saying my name. And I asked her if she was okay. She said she was fine. After I was on top of [the victim], [the victim] asked me to spread her legs a little bit. That's what I did. And I was rubbing my penis without my hands on her vagina. After that, I then asked [the victim] if I could penetrate her. . .the word I used, can I come inside you. [The victim] said yes. I slightly penetrated [the victim] with my penis. [The victim], again she got very aroused, she started saying my name again loudly. And while I paused and I said, are you okay? While I said that, at the same time, [the victim] said, I'm tight. I'm tight, don't stop, don't stop, come into me slowly. I took her direction. I started coming into her slowly with my penis. I penetrated her at least three or four times, no more than four and deeper than the first time. I knew what we were doing with—[the victim] and I were doing was wrong. I smelled blood. Well, I smelled an odd smell, I noticed the blood. When I noticed the blood, I took it as it was an opportunity to stop. And that's what I did. I stopped. I thought it was the Lord giving me an opportunity to stop because I didn't want to continue what we were doing. In my heart, that's not what I wanted to do even though I was doing it, what we were doing. So I stopped. I told [the victim] I think we need to stop. [The victim] got a little shy. She got a

little embarrassed. She sat up, she noticed the blood. And she got quiet.[13]

[Gonzalez] denied ever putting the victim's legs on his shoulders, or having his hands around her ankles. He also denied ever apologizing to the victim or admitting that he had a 'weakness.' He testified further that she never said 'no, don't.' He said:

The whole time we were in the bedroom, [the victim] was giving me direction to what to do. I was following her—after her direction. She told me to take her pants off. She told me to...rub my penis against her vagina. [The victim] was the one that told me not to stop. She gave me direction, instruction, you know, to come into her slowly. That's exactly what I did.[14]

Trial Court Pa.R.A.P. 1925(a) Opinion ("Opinion"), pp. 6-12.

The trial court provides an accurate account of K.M.'s and Gonzalez's testimony, but there is additional relevant evidence that the trial court does not mention. After concluding sexual intercourse, K.M. and Gonzalez returned to the living room to continue watching the movie. Gonzalez indicated that his cousin was coming over to visit, and K.M. asked him to take her home. Gonzalez assisted her, and she stood outside while Gonzalez went to get his car. Although the police station was across the street, K.M. did not make any telephone calls or attempt to go to the police station to report the incident. Gonzalez helped K.M. into the car, and they stopped at

_____

[13] N.T., 9/4/13, pp. 151, 157-160, 187.

[14] N.T., 9/4/13, pp. 180-183.

- 9 -

a gas station en route to her house. She did not use her cell phone at the gas station or report the incident to anyone. Upon arriving at her home, Gonzalez helped her get out of the car.[15]

After K.M. entered her house, her sister asked her whether something was wrong. K.M. did not state that Gonzalez had assaulted her. K.M.'s mother questioned her. K.M. initially denied that anything was wrong but then stated: "I think he raped me."[16]

K.M. was taken to the hospital and eventually was interviewed by the police. A hospital nurse testified that she interviewed and examined K.M. at the hospital. The nurse's notes state: "He laid me back on the bed. And he went in. I said no." K.M. also stated that after the sexual encounter, she returned to the couch and continued to watch the movie. She also indicated that Gonzalez did not use any physical or verbal coercion during the encounter, and K.M. did not sustain any bruising or injury. There was blood on K.M.'s underwear. The nurse began but could not complete a full internal examination, because K.M. felt uncomfortable. K.M. was discharged from the hospital without any determination of the cause of her bleeding.[17]

---

[15] N.T., 9/3/13, pp. 89-91, 137, 145.

[16] N.T., 9/3/13, pp. 92-93, 147-49.

[17] N.T., 9/3/13, pp. 18, 21-22, 31, 40, 223, 230, 236, 238-239, 251.

Each party presented expert testimony on the cause of K.M.'s bleeding. The Commonwealth's expert testified that the blood on her underwear was not menstrual in nature. Gonzalez's expert testified that the blood was menstrual in nature.[18]

Gonzalez' first argument on appeal is a challenge to the sufficiency of the evidence. We first consider the evidence of rape. The Crimes Code defines rape in pertinent part as follows: "A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant. . .by forcible compulsion." 18 Pa.C.S. § 3121(a)(1). The Crimes Code defines "forcible compulsion" in relevant part as "compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101. This Court has observed "forcible compulsion" as the exercise of sheer physical force or violence and has also come to mean an act of using superior force, physical, moral, psychological or intellectual to compel a person to do a thing against that person's volition and/or will. **Commonwealth v. Ables**, 590 A.2d 334, 337 (Pa.Super.1991). A determination of forcible compulsion rests on the totality of the circumstances, including but not limited to this list of factors:

> the respective ages of the victim and the accused,
> the respective mental and physical conditions of the
> victim and the accused, the atmosphere and physical

---

[18] N.T., 9/4/2013 pp. 4-48 (Commonwealth's expert); N.T., 9/5/2013 pp. 4-63 (Gonzalez's expert).

> setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, *domination* or custodial control over the victim, and whether the victim was under duress.

***Commonwealth v. Rhodes***, 510 A.2d 1217, 1226 (Pa.1986) (emphasis added). It is not mandatory to show that the victim resisted the assault in order to prove forcible compulsion. ***Id***. The victim's uncorroborated testimony is sufficient to support a rape conviction. ***Commonwealth v. Wall***, 953 A.2d 581, 584 (Pa.Super.2009).

The distinction between forcible compulsion and lack of consent is important to remember. With regard to consent, the Crimes Code states: "The consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense." 18 Pa.C.S. § 311(a). "Forcible compulsion" means "something more" than mere lack of consent. ***Commonwealth v. Smolko***, 666 A.2d 672, 676 (Pa.Super.1995). "Where there is a lack of consent, but no showing of either physical force, a threat of physical force, or psychological coercion, the 'forcible compulsion' requirement. . .is not met." ***Id***.

The trial court comprehensively analyzed the sufficiency of the evidence of rape in its opinion denying Gonzalez's motion for post-trial relief. The court aptly described this case as "unique", because "it is not a case of

- 12 -

moral, psychological, or intellectual forcible compulsion that has often been found in circumstances involving a young, vulnerable victim and a perpetrator who is in a position of authority and trust." Opinion Denying Post-Trial Relief ("Post-Trial Opinion"), 11/5/13, p. 13. The court was careful to note that this case involved "two competent adults who formed a dating relationship" who had engaged in "some consensual intimacy (i.e. kissing, hugging)", and the incident "occurred during a planned date." *Id*., p. 14. Moreover, "the victim initiated kissing and touching with [Gonzalez] on the couch in his living room, willingly walked herself to the bedroom upon [Gonzalez's] request, and did not protest when he removed her pants and underwear." *Id*. Thus, the court found nothing about the respective ages or mental conditions of Gonzalez and K.M. that demonstrates forcible compulsion. *Id*. Gonzalez did not occupy a position of "authority or custodial control" over K.M., and she was not under duress. *Id*.

Despite these factors, the trial court reasoned that other details showed Gonzalez's "domination" over K.M. The court observed that K.M.'s cerebral palsy "was a physical condition that caused her to have stiff legs with limited movement and walk with crutches." *Id*., p. 16. During the encounter, "she was lying on her back, away from her crutches and her cell phone," all of which Gonzalez had placed beyond her reach, and she "was away from any objects she could use to help lift herself up. . ." *Id*. Gonzalez "was initially lying on top of her and then forced her legs apart and

cuffed her ankles on his shoulders. He also told [K.M.] to be quiet when she repeatedly said 'ow' during the penetration." *Id*. Although K.M. did not call out for help or try to push Gonzalez away with her arms, "resistance is not necessary to prove forcible compulsion" – and in any event, resistance would have accomplished nothing, since Gonzalez was too big to push off her body, and she was unable to kick due to her cerebral palsy. *Id*., pp. 16-17.

The trial court also concluded that there was evidence of "physical force." By itself, K.M.'s statement, "no don't", is not sufficient evidence of force, because this statement only indicates lack of consent, and "forcible compulsion is something more than lack of consent." *Id*. at 17 (citing *Commonwealth v. Berkowitz*, 641 A.2d 1161, 1165 (Pa.1994). Here, however, there was "something more," specifically, lack of consent *and* physical force:

> [Gonzalez] forc[ed] the victim's legs apart, ben[t] her knees, mov[ed] her ankles up to his shoulders and cuff[ed] her ankles while he penetrated her. The victim was unable to open her legs or bend her knees by herself. [Gonzalez] repositioned her legs when he penetrated her with his finger, and then again placed her legs back on his shoulders when he penetrated her with his penis a second time. Again, the victim was unable to move her legs to resist or prevent [Gonzalez's] actions.

*Id*., p. 17. Although this force "was not extreme, it was certainly unique to the factual circumstances of the case and sufficient to establish forcible compulsion by [Gonzalez] on this particular victim" beyond a reasonable doubt. *Id*., pp. 17-18.

- 14 -

We agree with the trial court's astute analysis by construing the evidence in the light most favorable to the Commonwealth. K.M.'s testimony establishes that she told Gonzalez that she did not want premarital intercourse. Gonzalez pretended to agree with K.M., but one day later, he maneuvered her into a position in which she was powerless to resist his advances. He took her to his apartment, where she had never been before. He placed her cell phone out of reach in a living room tray, and when they adjourned to his bedroom and lay down on his bed, he placed her crutches out of reach. Without her phone or crutches, she could not escape from the bed or contact an outside agency for help. He then disrobed her and lay on top of her. She uttered "no, don't," but instead of stopping, he forced her legs apart and cuffed them on his shoulders – movements she was incapable of performing herself due to her cerebral palsy. He then penetrated her with his penis and told her to be quiet when she repeatedly called out "ow". K.M.'s lack of consent ("no, don't"), combined with Gonzalez's use of domination and physical force, provide sufficient evidence of forcible compulsion to justify his conviction for rape. Gonzalez's contention that K.M. initiated sexual intercourse and that he followed her directions does not undermine the sufficiency of the evidence. ***Commonwealth v. Andrulewicz***, 911 A.2d 162, 166 (Pa.Super.2006) ("the court was free to accept [the victim's] characterization of what transpired with Appellant, particularly her representation that Appellant

'raped' her"); **Filer**, 846 A.2d at 141 (victim's testimony that defendant digitally penetrated her was sufficient evidence for jury to find defendant guilty of aggravated indecent assault despite defendant's different version of events).

The evidence is also sufficient to support Gonzalez's conviction for aggravated indecent assault. The Crimes Code defines this offense in pertinent part as follows:

> Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse), and 3124.1 (relating to sexual assault), a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:
>
> (1)   The person does so without the complainant's consent; [or]
> (2)   The person does so by forcible compulsion.

18 Pa.C.S. § 3125(a). Digital penetration is sufficient to support a conviction for aggravated indecent assault, **Commonwealth v. Filer**, 846 A.2d 139, 141 (Pa.Super.2004), as is penetration with the defendant's penis. **Commonwealth v. Castlehun**, 889 A.2d 1228, 1233 (Pa.Super.2005) (evidence was sufficient to support finding that defendant penetrated victim's vagina, as required to support aggravated indecent assault conviction; victim testified that defendant both digitally penetrated her vagina and inserted his penis into her vagina).

Here, Gonzalez penetrated K.M. with his finger and then with his penis. K.M. testified that she said "no, don't" and that Gonzalez "raped" her. This evidence demonstrates that each penetration occurred without K.M.'s consent. *Andrulewicz*, *Filer*, *supra*. And as explained on pages 11-14, the evidence also is sufficient to demonstrate forcible compulsion. Thus, the evidence is sufficient to prove aggravated indecent assault beyond a reasonable doubt.

The same evidence is sufficient to sustain Gonzalez's conviction for sexual assault. The Crimes Code defines this offense in pertinent part as follows: "A person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1. Resistance to the sexual assault is not a requisite for sustaining a conviction for sexual assault. *Andrulewicz*, 906 A.2d at 165-66. The evidence demonstrates that Gonzalez and K.M. engaged in sexual intercourse without K.M.'s consent.

Gonzalez's second argument on appeal is that the verdict is contrary to the weight of the evidence. We disagree.

The law pertaining to weight of the evidence claims is well-settled. The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268,

1273–74 (Pa.Super.2005). A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa.Super.2007). Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Id.*

On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Knox*, 50 A.3d 732, 738 (Pa.Super.2012). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. *Forbes*, 867 A.2d at 1273–74.

The trial court fully and satisfactorily explains why Gonzalez's weight of the evidence claim is unsuccessful:

> The [c]ourt disagrees with [Gonzalez]'s statement that totality of the evidence presented at trial established that any sexual relations that [Gonzalez] had with the victim were consensual in nature. True, much of the evidence presented at trial did establish that the victim and [Gonzalez] engaged in some consensual kissing and touching prior to the sexual intercourse, but the testimonies of the victim and [Gonzalez] clearly conflict regarding whether the sexual intercourse itself was consensual. The sexual

- 18 -

intercourse is the subject of the criminal convictions at issue, not anything that occurred prior.

Regardless. . .it is entirely irrelevant what the totality of the evidence does or does not establish, because the jury is free to believe all, part, or none of the evidence presented at trial. The victim's testimony shows that the sexual intercourse that occurred in [Gonzalez]'s bedroom on March 8, 2011 was not consensual.  For example, after detailing the events in [Gonzalez]'s bedroom, the victim went on to testify that [Gonzalez] 'raped her.' (N.T. 9/3/2013 p. 93, 97, 183). She agreed with the Commonwealth's statement that she never gave [Gonzalez] permission to have sexual intercourse with her, and said "no, don't" when [Gonzalez] lay on top of her. *Id*. at 97. Due to the nature of the verdict, the jury evidently found the victim credible, and elected not to believe [Gonzalez]'s version of events. *See Commonwealth v. Hunzer*, 868 A.2d 498, 507 (Pa.Super.2005). Conflicts between the testimonies of the victim and [Gonzalez] are for the jury to resolve, and review of the jury's credibility determinations is not for the trial court to undertake. As referenced above, a new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer*, 744 A.2d at 751-52. The jury weighed the evidence presented, evaluated the testimony of the witnesses, and made a determination thereupon. It was entitled to believe the victim and to find [Gonzalez] incredible.

The Court also disagrees with [Gonzalez]'s argument that the testimony presented at trial did not establish forcible compulsion, threat of forcible compulsion or the absence of consent.  We have already found that the victim's testimony at trial established forcible compulsion and the absence of consent. . .Although [Gonzalez]'s version of events does not establish either, the jury found the victim and her testimony credible and discredited that of [Gonzalez]. The Court will not disturb the jury's credibility determinations here.

> After careful review of the record, the Court cannot find the verdicts so contrary to the evidence as to shock one's sense of justice and make an award of a new trial imperative.  Consequently, the Court does not find [Gonzalez]'s testimony and version of events so clearly of greater weight than the victim's that failure to give it credence amounts to a denial of justice. [Gonzalez] is not entitled to a new trial as the verdicts are not against the weight of the evidence.

Opinion, pp. 17-19.  For the reasons given by the trial court, we conclude that it properly exercised its discretion in denying Gonzalez's challenge to the weight of the evidence.

In his third argument on appeal, Gonzalez contends that the trial court erred in admitting into evidence an audiotape of K.M.'s statement to the police on March 13, 2011, several days after the incident and over two years before trial.[19]  The trial court held that the audiotape was admissible under Pa.R.E. 613(c) as a prior consistent statement.  Gonzalez contends that the audiotape did not qualify as a prior consistent statement.  Gonzalez argues that the audiotape prejudiced him, because K.M.'s sobbing voice made the jury sympathize with her and become inflamed against him.

As the appellant, Gonzalez has the duty to ensure that the record is complete for purposes of appellate review.  ***Commonwealth v. Griffin***, 65 A.3d 932, 936 (Pa.Super.2013).  The record in this case does not include the

---

[19] The court permitted the Commonwealth to play the tape during trial. N.T., 9/3/2013, p. 96.

audiotape or even a transcript of K.M.'s statement, thus thwarting our review of Gonzalez's argument. *Commonwealth v. Preston*, 904 A.2d 1, 6 (Pa.Super.2006) (*en banc*). Accordingly, we find this argument waived. *Commonwealth v. Powell*, 956 A.2d 406, 422-23 (Pa.2008) (defendant waived appellate review of his claim that trial court erred at trial for capital murder in admitting a certain autopsy photograph; photograph was not contained in the record, and the Supreme Court was accordingly unable to assess defendant's claim, which was based on his assertions that photograph was gruesome and had a strong likelihood that it would inflame passions of jury).

In his fourth argument on appeal, Gonzales asserts that the trial court abused its discretion in granting the Commonwealth's motion to preclude evidence concerning K.M.'s mental health diagnoses. This argument has two subparts – a claim that the trial court should have permitted evidence concerning K.M.'s mental health diagnoses, and a claim that the trial court erred in refusing to compel the Commonwealth to produce mental health records pertaining to K.M from an alleged mental health facility, Brooklane Health Services ("BHS"). Neither subpart is persuasive.

The relevant procedural history is as follows. In mid-2012, the Commonwealth produced K.M.'s medical records from Waynesboro Hospital (July 1, 2006 through August 31, 2006 and February 1, 2009 through March 1, 2009), Cumberland Valley Women's Group (February 1, 2008 through

March 1, 2009), Antrim Family Medicine (February 1, 2008 through March 1, 2009) and Hershey Medical Center (January 1, 2004 through January 30, 2013) (collectively "the medical facilities"). These records delineated K.M.'s medical treatment both before and after the assault.

Gonzalez also demanded K.M.'s records from BHS,[20] which he alleged is a mental health facility[21] that K.M. checked into "shortly after" the assault.[22] The trial court repeatedly denied Gonzalez's requests for the BHS records.[23]

On July 23, 2013, the Commonwealth moved to preclude evidence of K.M.'s mental health diagnoses in the medical facilities' records.[24] In

_____

[20] Defendant's Motion Requesting Order Of Court To Release Criminal Complainant's School Records And Medical Records (Doc. # 15) (filed December 29, 2011); Defendant's Motion For Reconsideration Of Denial Of Defendant's Motion Requesting Order Of Court To Release Criminal Complainant's School Records And Medical Records (Doc. # 19) (filed February 17, 2012); Defendant's Memorandum In Support Of Defendant's Motion For Reconsideration, p. 5 (Doc. # 82) (filed August 26, 2013).

[21] The Commonwealth did not dispute below, and does not dispute here, that BHS is an actual, extant mental health facility. Therefore, we assume for purposes of this appeal that BHS is an actual, extant mental health facility.

[22] Defendant's Memorandum In Support Of Defendant's Motion For Reconsideration, p. 5 (Doc. # 82) (filed August 26, 2013).

[23] Order Dated January 31, 2012 (Doc. # 18); Order Dated March 16, 2012 Denying Defendant's Motion For Reconsideration (Doc. # 23); Order Dated August 29, 2013 Denying Defendant's August 26, 2013 Motion For Reconsideration (Doc. # 83).

[24] Commonwealth's Motion In Limine (Doc. # 71) (filed July 23, 2013).

response, Gonzalez obtained an expert report[25] which opined: "The diagnoses [in the medical records] of depression (noted to be worsening) and anxiety *may* affect perception and recollection. Diagnoses of depression and anxiety and the medications used to treat these diagnoses *may* affect perception and recollection."[26] [Emphasis added] On August 13, 2013, the trial court granted the Commonwealth's motion to exclude evidence of K.M.'s mental health diagnoses in the medical facilities' records.[27]

We first address the trial court's order precluding evidence of K.M.'s mental health diagnoses. In general, the admission of evidence

> is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of the evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

---

[25] Defendant's Response To Commonwealth's Motion In Limine, Exhibit "A" (Doc. # 72) (filed July 29, 2013) (expert report of Kathleen Brown, Ph.D., RN, associate practice professor at the University of Pennsylvania's School of Nursing).

[26] Defendant's Response To Commonwealth's Motion In Limine, Exhibit "A", p. 4.

[27] Opinion And Order Dated August 12, 2013 (Doc. # 77).

***Commonwealth v. Weakley****, 972 A.2d 1182, 1188 (Pa.Super.2009).*

Furthermore, when determining the admissibility of evidence of a witness'

mental instability,

> [t]he crucial determination that a trial judge must
> make. . .is whether [this evidence] is related to the
> subject of the litigation or whether it affects the
> testimonial ability of the witness so as to impeach
> him. The evidence can be said to affect the credibility
> of a witness when it shows that his mental
> disorganization in some way impaired his capacity to
> observe the event at the time of its occurrence, to
> communicate his observations accurately and
> truthfully at trial, or to maintain a clear recollection
> in the meantime.

***Commonwealth v. Mason****, 518 A.2d 282, 285 (Pa.Super.1986).*

In this case, Gonzalez contends that the report of his expert, Dr.

Brown, created enough questions about K.M.'s ability to perceive and recall

events that the trial court should have denied the Commonwealth's motion

to preclude evidence of K.M.'s mental instability. The law on the

admissibility of expert testimony is well settled. Pa.R.E. 703 provides:

> The facts or data in the particular case upon which
> an expert bases an opinion or inference may be
> those perceived by or made known to the expert at
> or before the hearing. If of a type reasonably relied
> upon by experts in the particular field in forming
> opinions or inferences upon the subject, the facts or
> data need not be admissible in evidence.

Under this rule,

> expert testimony is incompetent if it lacks an
> adequate basis in fact. While an expert's opinion
> need not be based on absolute certainty, an opinion
> based on mere possibilities is not competent

- 24 -

> evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

*Gillingham v. Consol Energy, Inc.*, 51 A.2d 841, 849 (Pa.Super.2012). While an expert need not use "magic words," the foundation of her opinion must still be sturdy. As our Supreme Court has emphasized, the expert must base the substance of her opinion on a reasonable degree of certainty instead of mere speculation. *Commonwealth v. Spotz*, 756 A.2d 1139, 1150 (Pa.2000) (forensic pathologist's testimony in first-degree murder trial as to victim's manner of death was properly based on reasonable degree of medical certainty, though pathologist did not use those "magic words," where pathologist explained that victim had been shot in neck and chest, that amount of hemorrhage surrounding gunshot wounds indicated she was shot while she was alive, and that minimal hemorrhage surrounding other wounds indicated she was run over after she died).

In our view, Dr. Brown grounded her report on "on mere possibilities" instead of a reasonable degree of certainty. *Gillingham*, *supra*, 51 A.3d at 849. She stated only that K.M.'s diagnoses of depression and anxiety in the medical records "*may* affect [her] perception and recollection." She failed to opine that K.M.'s alleged depression or anxiety impaired her perception or recall of the critical events at the heart of this case. Because her report was nothing more than "conjecture or surmise," *Id.*, the trial court acted within

its discretion by excluding evidence of K.M.'s mental health diagnoses in the records provided by the Commonwealth.[28]

We turn to Gonzalez's contention that the trial court erred by denying his requests to compel the Commonwealth to produce K.M.'s records from BHS. Gonzalez apparently believes that the BHS records might bolster his claim that K.M. "[lacked] capacity to observe the event at the time of its occurrence, to communicate [her] observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime." **Mason**, **supra**, 518 A.2d at 285. We review the trial court's discovery rulings for abuse of discretion. **Commonwealth v. Robinson**, 834 A.2d 1160, 1166 (Pa.Super.2003).

---

[28] It bears mention that despite the trial court's ruling, it permitted counsel to ask questions about K.M.'s medication use, yet none of the evidence showed that the medications affected her ability to testify. For example, defense counsel asked K.M. if she had "taken any medications today that might affect [her] ability to continue?" N.T. 9/3/2013, p. 147. K.M. responded in the negative, and defense counsel asked: "Are there any medications that you needed to take that you didn't have a chance to take?" **Id**. K.M. again responded in the negative. **Id**. The Commonwealth asked K.M.'s mother if she was familiar with several different medications that K.M. took due to her cerebral palsy. **Id**. at 206. K.M.'s mother responded that she was, and the Commonwealth asked if she had "noticed any problems with disorientation, memory loss, or anything like that as a result of that medication." **Id**. K.M.'s mother responded that there were problems which lasted about a week when the victim first started taking the medications when she was 25, but at the time of the assault, March 2011, she did not recall K.M. having any problems with awareness or orientation in time or place. **Id**.

For two reasons, we conclude that the trial court acted within its discretion by denying Gonzalez access to the BHS records. First, despite Gonzalez's claims that K.M. sought in-patient treatment at BHS "shortly after" Gonzalez's assault, we find nothing in the record which establishes when, if ever, K.M. received treatment at BHS. Absent such indicia, we have no way to gauge the relevance of the BHS records. Moreover, Dr. Brown, Gonzalez's expert, reviewed copious medical records from the aforementioned medical facilities relating to K.M.'s treatment from mid-2006 through early 2013, both before and after Gonzalez's assault. The most that Dr. Brown can say after reading 6½ years of medical records is her wholly inadequate remark that K.M.'s depression and anxiety "may affect perception and recall." Under these circumstances, it seems rather speculative for Gonzalez to suggest that the BHS records would have provided anything more helpful to his defense.

Second, assuming that K.M. received treatment at BHS, the BHS records are privileged and not subject to release without K.M.'s consent.[29] The Mental Health Procedures Act ("MHPA") provides in relevant part:

---

[29] Although the trial court did not discuss the subject of privilege, we still have the authority to affirm on this ground. *Bradley v. General Acc. Ins. Co.*, 778 A.2d 707, 710 n. 2 (Pa.Super.2001) ("we may affirm the decision of [the trial] court if the result is correct on any ground").

(a) All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:

(1) those engaged in providing treatment for the person;
(2) the county administrator, pursuant to section 110;
(3) *a court in the course of legal proceedings authorized by this act*; and
(4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent.

50 P.S. § 7111 (emphasis added). The MHPA must be strictly construed. ***Commonwealth v. Moyer***, 595 A.2d 1177, 1179 (Pa.Super.1991). Construed strictly, the MHPA limits judicial use of mental health records to mental health commitment proceedings unless the patient consents to their use in other judicial proceedings. 50 P.S. § 7111. ***Moyer*** speaks definitively on this point:

> The unambiguous language of section 7111(3) leads us to conclude that a patient's inpatient mental health treatment records may be used by a court *only* when the legal proceedings being conducted are *within the framework* of the MHPA, that is, involuntary and voluntary mental health commitment proceedings. ***See*** 50 P.S. § 7103 (MHPA establishes the rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons). ***See also Kakas***

> ***v. Commonwealth of Pennsylvania***, 65
> Pa.Cmwlth. 550, 442 A.2d 1243 (1982). We can find
> no language within the [MHPA] itself which includes
> criminal proceedings within the framework of the act,
> nor can we find any caselaw in the Commonwealth
> which supports such a proposition.

*Id*. (emphasis in original). The records at issue in ***Moyer*** were mental health records of a criminal defendant, while the mental health records in this case pertain to a criminal complainant (K.M.). Nevertheless, ***Moyer's*** construction of section 7111(3) applies with equal force to this case. Because this case is not a voluntary or involuntary mental health commitment proceeding, K.M.'s mental health records are not discoverable absent K.M.'s consent to their release. Nothing in the record indicates that K.M. consented to the release of BHS records. Thus, they have no place in this criminal case.

We do not agree with Gonzalez's argument that ***Commonwealth v. Dudley***, 510 A.2d 1235 (Pa.Super.1986), requires disclosure of K.M.'s BHS records. In ***Dudley***, a complainant received psychiatric treatment at two hospitals within several months after an alleged rape. The complainant had hallucinations and suffered a psychotic episode approximately two months after the incident and approximately six months before trial. According to a psychiatrist who treated her, the complainant had a "hysterical personality, which means when she gets overwhelmed or needs more attention, and [sic] she does have childish attention-seeking behavior. . .then she has fainting

spells." *Id*., 510 A.2d at 1238. The trial court ruled that defense counsel could not introduce the testimony of a psychiatrist who treated the complainant at one of the hospitals. This Court determined that the trial court abused its discretion by excluding psychiatric testimony regarding the complainant's post-incident hospitalization, because "[the complainant's] mental disorganization in some way impaired [her] capacity to observe the event at the time of its occurrence, to communicate [her] observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime." *Id*.

*Dudley* is distinguishable from the present case. Unlike *Dudley*, the record in this case does not reveal whether the facility in question, BHS, is a mental health facility, or when K.M. received treatment at BHS. In addition, the complainant's diagnosis in *Dudley* clearly implicated her abilities to perceive and recall critical events. Here, despite in-depth review of years of medical records, Gonzalez's expert did not opine to a reasonable degree of certainty that K.M.'s depression and anxiety affected her ability to perceive and recall the events of March 8, 2011. Simply put, nothing in the present record demonstrates that the alleged BHS records have any relevance. Moreover, *Dudley* did not analyze whether the MHPA barred disclosure of the complainant's records.

In his fifth issue on appeal, Gonzalez argues that he is entitled to a new trial because the trial court permitted the Commonwealth to read K.M.'s

entire preliminary hearing testimony into the record during the Commonwealth's redirect examination of K.M. According to Gonzalez, the trial court improperly permitted the Commonwealth to present inadmissible prior consistent testimony. As discussed above, we review the trial court's decision to admit or deny evidence for abuse of discretion. We detect no abuse of discretion in the court's decision to permit the Commonwealth to read K.M.'s preliminary hearing testimony into the trial record.

During K.M.'s cross-examination, defense counsel impeached her with several excerpts from her preliminary hearing testimony. Defense counsel used a portion of K.M.'s preliminary hearing testimony to discuss whether she was confused about having any physical contact with the Defendant prior to March 8, 2011.[30] Counsel also attempted to show inconsistencies regarding how K.M. said the alleged finger penetration occurred.[31] In addition, counsel tried to call K.M.'s attention to inconsistencies in her testimony about the amount of questions her mother had asked her the night of the incident.[32] On redirect, the Commonwealth said to K.M.: "[W]hat I'd like to do now is go over your testimony basically, in full,

---

[30] N.T., 9/3/2013, pp. 109-110.

[31] N.T., 9/3/2013, pp. 129-130.

[32] N.T., 9/3/2013, pp. 148-149.

between page 5 and page 17 so that the jury gets a fair and accurate depiction of what the entire testimony was instead of little bits and pieces."[33] Defense counsel objected and asked for an offer of proof and an explanation as to relevancy.[34] The Commonwealth argued the rule of completeness and stated that defense counsel had "taken bits and pieces of testimony and cross-examined the witness about it. The jury needs to hear what the entire testimony was so they can determine what was said."[35] The trial court allowed the Commonwealth to read K.M.'s entire preliminary hearing testimony at trial.[36] On recross, the court permitted defense counsel to read relevant portions of the victim's preliminary hearing testimony.[37]

The scope of redirect examination is largely within the discretion of the trial court. **Commonwealth v. Dreibelbis**, 426 A.2d 1111, 1117 (Pa.1981). When a party raises an issue on cross-examination, it is no abuse of discretion for the court to permit redirect on that issue to dispel any unfair inferences. **Id.**, 426 A.2d at 1117. The trial court reasoned that

---

[33] N.T., 9/3/2013, p. 169.

[34] N.T., 9/3/2013, p. 170.

[35] N.T., 9/3/2013, p. 170.

[36] N.T., 9/3/2013, pp. 170-182.

[37] N.T., 9/3/2013, pp. 184-202.

its decision to permit the Commonwealth to read K.M.'s preliminary hearing testimony into the record on redirect does not warrant a new trial:

> We permitted the Commonwealth to redirect the victim with her preliminary hearing testimony to dispel any unfair inferences that reading small portions of the testimony out of context raised. We did not abuse our discretion in allowing the Commonwealth to do so. Unfortunately, while reading the Preliminary Hearing testimony onto the record, the Commonwealth went far beyond the issues that were raised by defense counsel on cross-examination. Consequently, the Court permitted defense counsel to read other relevant portions of the victim's preliminary hearing testimony on recross to give both parties the same opportunity. Admittedly, the Commonwealth's redirect went beyond what the Court had intended, yet defense counsel was given an equal opportunity to do the same, and we did not abuse our discretion in initially allowing the Commonwealth the opportunity to dispel any unfair inferences.

Opinion, pp. 48-49. We agree with the trial court's reasoning that it acted within its discretion in its initial decision to permit the Commonwealth to read K.M.'s preliminary hearing testimony into the trial record.

Even if the trial court erred in permitting the Commonwealth to read too much of K.M.'s preliminary hearing testimony into the record, any error was harmless. "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." ***Commonwealth v. Hairston***, 84 A.3d 657, 671 (Pa.2014). Harmless error exists if the record demonstrates, *inter alia*, that the error did not prejudice the defendant or the prejudice was *de minimis*. ***Id***.

Gonzalez's brief does not identify specific examples of prejudice that he suffered from the reading of K.M.'s preliminary hearing testimony. He simply proclaims, without specific citations, that the trial court "allowed the Commonwealth to present inadmissible prior consistent testimony." This bald assertion does not establish that Gonzalez suffered prejudice.

In his final argument on appeal, Gonzalez insists that his sentence is unreasonable and excessive. He further asserts that while the sentences imposed did not exceed the statutory maximum and were within the standard range of the sentencing guidelines, they are still excessive.

This is a challenge to the discretionary aspects of Gonzalez's sentence. Our standard of review is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch*, 936 A.2d 515, 517–18 (Pa.Super.2007).

The right to appellate review of the discretionary aspects of a sentence is not absolute and must be considered a petition for permission to appeal. *Hoch*, 936 A.2d at 518. An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence. We must consider:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa.Super.2010).

Here, Gonzalez timely filed his notice of appeal within thirty days after the trial court denied his post-sentence motions. Pa.R.Crim.P. 720(A)(2). He preserved the challenge to his sentence in his post-sentence motions and included a Pa.R.A.P. 2119(f) statement in his brief. Further, he raises a substantial question, i.e., a plausible argument that the sentencing court either acted inconsistently with a specific provision of the code, or acted "contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Bullock*, 868 A.2d 516, 528 (Pa. Super. 2005). The substantial question in Gonzalez's brief is an "excessive sentence claim[] in conjunction with an assertion that the court did not consider mitigating factors." *Commonwealth v. Dodge*, 77 A.3d 1263, 1272 (Pa.Super.2013) (*en banc*).[38]

---

[38] In a thorough analysis, *Dodge* demonstrates that this Court has reached inconsistent decisions as to whether the claim that the trial court failed to various mitigating factors when fashioning the defendant's sentence constitutes a "substantial question". *Id*., 77 A.3d at 1272 n. 8. In the same discussion, *Dodge* held that a substantial question exists when the defendant asserts both a claim of excessiveness **and** the trial court's failure to take mitigating circumstances into account. *Id*. at 1272-73.

We determine, however, that Gonzalez's excessiveness claim is devoid of merit. We find persuasive the trial court's thorough analysis of this question:

> [Gonzalez] argues that the Court failed to properly weigh[] certain mitigating circumstances, including his law abiding past, his education, his employment history, his community and familial support, and the fact that this was his first conviction. The Court disagrees as this argument is contradicted by the record. First, a pre-sentence investigation report was prepared by the Probation Department, and our Supreme Court has stated that, '[w]here pre-sentence reports exist, we shall continue to presume that the sentencing judge was aware of relevant information regarding [Gonzalez]'s character and weighed those considerations along with mitigating statutory factors.' ***Commonwealth v. Devers***, 546 A.2d 12, 18 (Pa. 1988). Not only did the Court thoroughly review [Gonzalez]'s pre-sentence investigation report, but also considered [Gonzalez]'s twenty-four letters of support, heard and considered the individuals who came forth to support [Gonzalez] at sentencing, and heard what his attorney stated on his behalf. ***See*** N.T. 12/18/2013 p. 41. Acknowledging this information, the Court stated, '[t]he witnesses that have testified in your support and the letters provided for those who are absent today all attest to your good moral character, your commitment to the community in general, and to your church.' ***Id***. The Court stated further:
>
> > Notwithstanding the uncontested good deeds that are attested to in these documents relative to your community, the issue alone is not whether you are viewed as an upstanding contributing member of society. The focus today must be on what you did do to this victim on March 8th of 2011 and how should you be held accountable for your behavior on that day.

*Id*. at 41-42. Despite [Gonzalez]'s contentions otherwise, the Court did in fact consider and weigh mitigating factors, yet found them of lesser value when considering the gravity of [Gonzalez]'s crimes against the victim. Additionally, at the time of sentencing, [Gonzalez] still refused to 'acknowledge wrongdoing or the pain of the victim.' *Id*. at 42. Such lack of remorse and accountability weighed heavily in the Court's sentencing decisions and weighed against the mitigating factors [Gonzalez] claims the Court failed to consider. The Court reasoned that [Gonzalez]'s 'choice to not express remorse for the victim's consequences of that day limits the value of the character witnesses letters and testimony provided today such that I can consider them in shaping the sentence. But they cannot be viewed as an excuse for your behavior.' *Id*.

Finally, [Gonzalez] asserts that the Court unduly emphasized the nature of the crimes and their impact on the victim, and the physical limitations of the victim in sentencing [Gonzalez].  The Court disagrees because '[e]qual attention' was given to the victim and [Gonzalez]. *Id*. at 43. Also, the Court did not consider or discuss the victim's physical limitations at sentencing.  Furthermore, courts are required to consider the nature of the offenses and their impact on the victim.  A court must 'follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of [Gonzalez].'  [*Commonwealth v.*] *Mouzon*, 812 A.2d [617,] 620 [(Pa.2002)].

Again, in imposing concurrent sentences of four to fifteen years for the rape conviction and two to ten years for the aggravated indecent assault conviction, the Court imposed sentences at the lowest end of the standard ranges. *See* N.T. 12/18/2013 p. 44. He will be serving his two sentences at the same time for an aggregate sentence of four to fifteen

years. At sentencing, the Commonwealth requested he be sentenced to eight to seventeen years, at the top of the standard range. *Id*. at 2, 44. Additionally, the Court properly took 'into consideration [Gonzalez]'s history and characteristics, but...also...the events of the day that led to [Gonzalez]'s conviction for rape and aggravated indecent assault.' *Id*.

Opinion, pp. 53-55.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/2015