J.A21001/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM HLUSHMANUK, | : | |
| | : | |
| Appellant | : | No. 2227 EDA 2014 |

Appeal from the Judgment of Sentence May 2, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division No(s).: CP-51-CR-0003766-2012

BEFORE: ALLEN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:           **FILED AUGUST 13, 2015**

Appellant, William Hlushmanuk,[1] appeals from the judgment of sentence entered following a bench trial in the Philadelphia County Court of Common Pleas. Appellant was found guilty of simple assault, aggravated assault, and recklessly endangering another person[2] ("REAP") for an incident in which he, *inter alia*, choked his ex-wife at a gas station.[3] On appeal, he

---

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant is also known as Bill Le. N.T. Sentencing, 5/2/14, at 61.

[2] 18 Pa.C.S. §§ 2701(a)(1), 2702(a)(1), 2705.

[3] The trial court opinion referred to the complainant in this matter, Jacqueline Diana, as Appellant's "ex-wife." Trial Ct. Op., 1/29/15, at 3. At the January 2014 trial, Diana referred to Appellant as her "ex-husband," and stated they separated in December 2010, but were not divorced. N.T. Trial,

challenges the weight and sufficiency of the evidence, the admission of evidence of a prior incident with his ex-wife, and the imposition of his sentence to run consecutive to an unrelated federal sentence.[4]  We affirm.

The court conducted a bench trial on January 6, 2014.  It summarized the underlying facts as follows:

> [O]n October 31, 2011, at approximately 9:45 p.m., [Appellant] violently attacked the victim, his ex-wife, [Diana,] at a gas station located at Welsh Road and Roosevelt Boulevard, Philadelphia, Pennsylvania.  The attack was witnessed by three independent and unrelated individuals: Philadelphia Police Lt. John Stanford[ ], Rebecca McBride and Natasha Cintron.  All three witnesses, as well as the victim, Ms. Diana, testified at trial.  The witness testimony was consistent, in that [Appellant] physically attacked the victim and choked her to a point of unconsciousness.  He was then observed dragging her around her vehicle and attempting to put her into a vehicle.  All of this took place in front of his young daughter.  [Appellant] was arrested at the scene by Philadelphia police.

Trial Ct. Op. at 3.  The trial court opined of the Commonwealth's witnesses as follows:

> The testimony presented at trial was consistent in

_____

1/6/14, at 73, 94.  They have two children together, one of whom, M., was present during the incident in this matter.  *Id.* at 73.

[4] We note the certified record transmitted on appeal does not include any notes of testimony.  Appellant, however, has included copies of the full transcripts of trial, the sentencing hearing, and post-sentence motion hearing in his reproduced record.  The Commonwealth does not object to these copies.  "While we will consider the cop[ies of the transcripts] in the reproduced record, we caution counsel that it is the appellant's burden to ensure that the certified record is complete.  *See* Pa.R.A.P. 1921 . . . ." *Commonwealth v. Landis*, 89 A.3d 694, 697 n.5 (Pa. Super. 2014).

> regard to [Appellant's] criminal conduct [and] sufficient to support this Court's findings of guilt. The witnesses' testimony was credible when taken both individually and was also consistent with one another when taken as a whole. Cross-examination revealed no bias, prejudice or mistake on the witnesses' part and inconsistencies, if any, were minor and without negative effect upon the overall determinations made by this Court.

*Id.* at 4. Appellant did not testify or present evidence.

The trial court found Appellant guilty of aggravated assault, simple assault, and REAP. On May 2, 2014, the court imposed an aggregate sentence of four to eight years' imprisonment and five years' probation.[5] The court ordered the sentence to run consecutive to an unrelated, seven year and eight months' "sentence for a federal Medicare fraud offense."[6] *See* N.T. Sentencing at 12, 19, 72-73. Appellant filed a timely post-sentence motion which raised claims relating to, *inter alia*, the four issues raised in the instant appeal. On July 9, 2014, the court granted partial relief

---

[5] Specifically, the court imposed the following sentences: (1) for aggravated assault, a felony of the first degree, the court imposed four to eight years' imprisonment and five years' probation; (2) for simple assault, a misdemeanor of the second degree, a concurrent two years' probation; and (3) for REAP, also a misdemeanor of the second degree, no further penalty as it merged with simple assault. Sentencing Order, 5/2/14.

[6] Husband had an "ambulance business" and Diana "worked for him." N.T. Trial at 94. Husband allegedly stole "a couple of million dollars from the federal government." *Id.* According to Appellant's counsel's statements at the sentencing hearing, his federal sentence commenced on May 16, 2013, and included a consecutive "three years federal release." N.T. Sentencing at 19. At the time of trial, Diana was "under indictment" and on "home arrest" for her role in that matter. N.T. Trial at 94, 95.

by holding simple assault merged with aggravated assault and vacating the concurrent two-year probation term. However, the court denied relief on Appellant's remaining claims. Appellant filed a timely notice of appeal and complied with the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

We address Appellant's first two issues together. First, he purports to challenge the sufficiency of evidence for aggravated assault.[7] Appellant maintains Diana did not sustain serious bodily and the Commonwealth failed to establish he acted intentionally, knowingly, or with a high degree of recklessness. In support, Appellant cites the following perceived inconsistent testimony by the Commonwealth's witnesses: (1) Lieutenant Stanford testified Appellant stood over Diana, who was lying on the ground on the driver's side of the vehicle, and then "Appellant picked up his wife by the neck[,] dragged her around . . . to the passenger side," and put two hands around her neck in a chokehold; (2) witness Rebecca McBride testified Diana was seated on the passenger side of the vehicle when "Appellant was pulled off of her," and Appellant was "'pinning down' his wife with one hand by her neck on the seat and the other hand holding her mouth;" (3) witness Natasha Cintron testified "the female was leaning into the passenger side of the vehicle at which time Appellant had only one hand around her neck;" (4)

---

[7] The relevant heading in Appellant's brief articulated a sufficiency challenge to simple assault and REAP as well. However, his discussion addresses only the elements of aggravated assault.

Diana "only recalled that Appellant was behind her when he put her into a choke hold, and that she passed out without recalling anything more." Appellant's Brief at 26. Furthermore, Appellant states that while Lieutenant Stanford testified the daughter M. was outside of the vehicle, "the female witnesses" indicated she was in the rear seat. *Id.* Appellant also notes Diana's testimony that "immediately before placing her into a chokehold," Appellant said "I'm never letting you go home. Do you hear me right now? You're not going home." *Id.* at 27. However, he maintains, "none of the eyewitnesses heard [him] make any statements before, during or after the incident." *Id.* at 28. Appellant, however, does note Diana's testimony that earlier that evening, he "yelled to her 'I'm going to F'ing kill you.'" *Id.*

In his second claim on appeal, Appellant argues the verdicts for aggravated assault and REAP were against the weight of the evidence. In support, he reiterates: (1) although Diana testified he made threatening statements, none of the other witnesses heard them; and (2) "[t]he eyewitnesses have conflicting observations as to what Appellant did to his wife." *Id.* at 28. Appellant requests this Court to "carefully scrutinize[ ]" Diana's credibility," as she pleaded guilty to federal charges "of Health Care Fraud, Conspiracy to Commit Health Care Fraud, and Aiding and Abetting" Appellant, all of which "are crimes of dishonesty." *Id.* Appellant further asserts Diana has "refused to allow [him] to see his children at times" and that there have been no "reports of any violence and/or threats" since the

underlying incident. *Id.* We find no relief is due.

Preliminarily, we hold Appellant's first issue, which argues inconsistencies in the witnesses' testimony, goes to the weight, not sufficiency, of the evidence. *See Commonwealth v. Trinidad*, 96 A.3d 1031, 1038 (Pa. Super. 2014) (stating (1) variances in testimony go to credibility of witnesses and not sufficiency of evidence and (2) mere conflict in testimony does not render evidence insufficient because it is within province of fact finder to determine weight to be given to testimony and to believe all, part, or none of evidence), *appeal denied*, 99 A.3d 925 (Pa. 2014). We thus consider Appellant's first and second issues under weight of the evidence guidelines.

"[A]ppellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015) (citation omitted).

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Id.* (citations omitted).

As stated above, the trial court specifically found the Commonwealth's

"witness[es'] testimony was consistent," "credible when taken both individually and . . . also consistent with one another when taken as a whole." Trial Ct. Op. at 3-4. The trial court reproduced in detail the testimony of Diana, Lieutenant Stanford, and eyewitnesses McBride and Cintron. *Id.* at 4-23. We decline Appellant's request to reweigh Diana's credibility, as our role is to "review of the trial court's exercise of discretion, not . . . the underlying question of whether the verdict is against the weight of the evidence." *See Gonzalez*, 109 A.3d at 723. Instead, the trial court, sitting as finder of fact, was "free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *See id.* After careful review of the parties' briefs, the trial court's opinion, and the record, including the trial transcript, we adopt the pertinent law and analysis set forth in the trial court's opinion. *See* Trial Ct. Op. at 24-26 (rejecting Appellant's claim that his actions did not put Diana in danger of serious bodily injury and finding: (1) need for medical attention is not element of crimes charged, (2) Appellant "is trained in karate and holds a black belt, [which] compounded is ability to inflict harm," (3) "trial evidence showed [Appellant] specifically and successfully targeted Ms. Diana with his violent actions," (4) Diana and three witnesses testified Appellant choked her, Diana lost consciousness, and her body went limp, and (5) Appellant's assault "was directed at her head and neck region and caused [Diana] to lose consciousness"). We agree that the court's verdict does not shock the

conscience. **See Gonzalez**, 109 A.3d at 723. Accordingly, we find no relief is due on Appellant's first two issues.

Appellant's third claim on appeal is that the trial court erred in allowing evidence of a prior incident involving Diana.[8] He asserts the prior act was "too remote in time, and not part of the incident that occurred [in this case] to be considered part of the same crime." Appellant's Brief at 35. We find no relief is due.

At this juncture, we summarize the challenged evidence, which the Commonwealth presented through direct examination of Diana. **See** N.T. Trial at 74-85. Diana testified to the following. On December 20, 2011, approximately ten months prior to the instant incident, she and the children stayed at her parents' house in Northeast Philadelphia. Around 1:00 a.m., Appellant called and said, "No, you're coming home," and "Even if I have to come in there and drag you out," and "curs[ed Diana] out." **Id.** at 75. "[A] few minutes later," while Diana was still on the phone with him, Appellant was at the door, and "it sounded like he was kicking the door in." **Id.** at 76. Diana went to the basement, someone called the police,[9] and Diana heard her father open the door and tell Appellant to leave. Diana's father called

---

[8] The Commonwealth filed a pre-trial motion to admit this evidence of a prior bad act. The parties argued the motion immediately prior to trial, and the court granted it.

[9] Diana testified only, "We already called the police." N.T. Trial at 77.

Appellant's father, who arrived, and eventually Diana went outside. Appellant "grabbed [Diana's] neck in midair and body slammed [her] on the ground." *Id.* at 79-80. Appellant "was on top of" Diana, her "chest really hurt," and she could not breathe. *Id.* at 80-81. Both Diana's father and Appellant's father attempted "to help by getting [Appellant] off" of her. *Id.* at 81. Finally, Diana and her father returned inside, the police arrived, Diana gave a statement to them, but Appellant was not charged.[10] *Id.* at 82. Diana went to the hospital at 2:00 a.m. the following night, believing she had a broken rib, but learned she "was just bruised." *Id.* at 97-98.

This Court has stated: "Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion." *Trinidad*, 96 A.3d at 1036 (citation omitted).

> "[E]vidence of crimes other than the one in question is not admissible solely to show the defendant's bad character or propensity to commit crime." [*S*]*ee* Pa.R.E. 404(b)(1). Nevertheless, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2)[.] "In order for evidence of prior bad acts to be admissible as evidence of motive, the prior bad acts 'must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the

---

[10] In his brief, Appellant states he was "charged, but the charges were withdrawn after his wife failed to appear for court." Appellant's Brief at 32-33.

> prior set of facts and circumstances.'" "Additionally, evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts."

*Commonwealth v. Ferguson*, 107 A.3d 206, 211 (Pa. Super. 2015) (some citations omitted).

In the case *sub judice*, the trial court allowed Diana's testimony about the prior incident under Rule of Evidence 404(b)(2), finding:

> [E]vidence that [Appellant] had previously assaulted and committed physical violence upon his estranged wife by choking her previously to the night in question was relevant and probative of [Appellant's] motive and intent for committing the assaults upon his ex-wife.
>
> The factual basis of the present charges against [Appellant] indicated that he became violently aggressive towards her, choking until the point of lost consciousness. Evidence that [Appellant] had previously engaged in the same behavior with Ms. Diana was relevant and admissible as it was closely linked in similarity and nature to the charged offenses. This degree of similarity is an important factor in determining the admissibility of other crimes or bad acts as relevant to show a common scheme or plan.

Trial Ct. Op. at 34 (citation omitted). We agree with the court's analysis and find no abuse of discretion. *See* Pa.R.E. 404(b)(2); *Ferguson*, 107 A.3d at 211; *Trinidad*, 96 A.3d at 1036.

Appellant's final issue on appeal is a challenge to the discretionary aspects of his sentence. As stated above, the court imposed an aggregate term of four to eight years' imprisonment, to run consecutive to his federal sentence of seven years and eight months. Appellant alleges "the imposition of this sentence, albeit within the Standard Guideline range, but ordered to

run consecutively to his federal sentence, was unreasonable[,] inconsistent with his rehabilitative needs," and "not consistent with the protection for the public and the victim." Appellant's Brief at 37, 38. He explains the underlying incident occurred when he and his wife were separated, they were "under review by the federal law enforcement authorities regarding their ambulance business," "and the parties were under a tremendous amount of stress." *Id.* at 37-38. Although he acknowledges the prior, December 2010 incident, he avers "[t]here was no prior history of violence between" them. *Id.* at 38. Appellant further avers his sentence "goes above and beyond what should be considered appropriate to rehabilitate him," where "[h]is prior record does not show any violence towards a person.[11] *Id.* Instead, Appellant maintains, he "has demonstrated several years in the community as being a productive member of society by obtaining education, and being employed." *Id.* He adds the fact he now has a girlfriend "demonstrates that he no longer poses a threat to his wife as he has accepted the ending of their marital relationship." *Id.* at 39. Appellant concludes his sentence should have been imposed to run concurrently with this federal sentence. We find no relief is due.

We note:

---

[11] Appellant, however, acknowledges: (1) when he was eighteen years old, "he entered an auto auction" and was "charged with Burglary, for which he was placed on juvenile probation;" (2) at age twenty-one, he pleaded guilty to Possession of a Firearm; and (3) at age twenty-nine, he pleaded guilty to illegal transfer of a firearm. Appellant's Brief at 38.

Before this Court can address such a discretionary challenge, an appellant must comply with the following requirements:

An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

\* \* \*

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." Further:

A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

**Commonwealth v. Caldwell**, ___ A.3d ___, ___ 2015 WL 3444594 at \*2

(Pa. Super. May 29, 2015) (*en banc*) (some citations omitted), *alloc. filed*,

408 EAL 2015 (Pa. Jun. 29, 2015).

In **Caldwell**, an *en banc* panel of this Court stated:

A court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question. Rather, the imposition of consecutive rather than concurrent sentences will present a substantial question in only "the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment."

> To make it clear, a defendant **may** raise a substantial question where he receives consecutive sentences within the guideline ranges if the case involves circumstances where the application of the guidelines would be clearly unreasonable, resulting in an excessive sentence; however, a bald claim of excessiveness due to the consecutive nature of a sentence will not raise a substantial question.

*Commonwealth v. Dodge*, 77 A.3d 1263, 1270 (Pa. Super. 2013), . . . *appeal denied*, 91 A.3d 161 (Pa. 2014) (emphasis in original).

*Caldwell*, 2015 WL 3444594 at *3 (some citations omitted). This Court has also held that a "claim that the trial court erred in ordering [a sentence] to run consecutively, instead of concurrently, to a previously imposed sentence does not raise a substantial question." *Commonwealth v. Pass*, 914 A.2d 442, 446 (Pa. Super. 2006).

With respect to a claim that the trial court failed to consider a defendant's rehabilitative needs, the *Caldwell* Court noted:

> "[O]rdinarily, a claim that the sentencing court failed to consider or accord proper weight to a specific sentencing factor **does not** raise a substantial question." Specifically,

> > [t]here is ample precedent to support a determination that [a claim that the trial court failed to consider an appellant's rehabilitative needs] fails to raise a substantial question . . . .

> Similarly, "this Court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review."

> However, "prior decisions from this Court involving whether a substantial question has been raised by claims that the sentencing court 'failed to consider' or 'failed to

- 13 -

adequately consider' sentencing factors has been less than a model of clarity and consistency." In . . . **Dodge**, this Court determined an appellant's claim that the sentencing court "disregarded rehabilitation and the nature and circumstances of the offense in handing down its sentence" presented a substantial question. **Dodge**, [77 A.3d] at 1273.

This Court has also held that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question." Additionally:

In determining whether a substantial question exists, this Court does not examine the merits of whether the sentence is actually excessive. Rather, we look to whether the appellant has forwarded a plausible argument that the sentence, when it is within the guideline ranges, is clearly unreasonable. Concomitantly, the substantial question determination does not require the court to decide the merits of whether the sentence is clearly unreasonable.

**Caldwell**, 2015 WL 3444594 at *3-*4.

In the case *sub judice*, Appellant has filed a timely notice of appeal, preserved his sentencing claims in a post-sentence motion, and included a Pa.R.A.P. 2119(f) statement in his brief. **See id.** at *2. With respect to the consecutive nature of his sentence, we find Appellant has not raised a substantial question. His minimum sentence of four years is at the low end of the standard sentencing guideline, **see** Appellant's Brief at 37 (stating standard sentencing guideline was forty-eight to sixty-six months), and we decline to find this sentence, when coupled with his seven year and eight month-federal sentence, falls within "the most extreme circumstances" and

is so "clearly unreasonable" and excessive as to support a substantial question. *Cf. Caldwell*, 2015 WL 3444594 at *2-*3 (holding challenge to imposition of consecutive sentences, together with claim that court failed to consider rehabilitative needs, presented substantial question where aggregate sentence for aggravated assault, robbery, and related offenses was thirty-one to sixty-two years); *Dodge*, 77 A.3d at 1273 (holding defendant set forth substantial question with respect to consecutive nature of his sentence, which aggregated forty years and seven months to eighty-one years and two months, but upholding sentence on merits). *See also Pass*, 914 A.2d at 446.

However, in light of the discussion in *Caldwell*, we hold Appellant has raised a substantial question that the trial court failed to consider his rehabilitative needs and the protection of the public. *See Caldwell*, 2015 WL 3444594 at *3-*4. We thus consider the merits of his claim.

We note the relevant standard of review:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Id.* at *4 (citation omitted).

The trial court opined:

- 15 -

[T]he Presentence report revealed [Appellant] has had numerous contacts with the Court, making him RRRI ineligible. . . .

The Sentencing Guidelines recommended a sentence of 48 to 66 months (+/- 12 months). The Commonwealth recommended incarceration of 4 to 8 years incarceration, plus ten (10) years of reporting probation, in addition to other conditions. [Appellant's] counsel suggested a mitigated sentence of 3 to 6 years.

This Court imposed a sentence of 4 to 8 years incarceration, plus 5 years probation on the aggravated assault charge[,] to run consecutive to his federal prison term. The sentence imposed is well below the maximum sentence for a felony of the first degree of not more than twenty (20) years confinement.

To further support the imposition of a consecutive sentence, at his sentencing hearing, [Appellant] exercised his right of allocution. At no point during this address to the Court did he show any remorse, sorrow or any semblance of humanity. There was no apology to the victim, the mother of his children [or] members of his family. Instead, [Appellant] deflected blame to the victim and her family. He failed to accept any responsibility whatsoever for any of his actions.

In fact, the Presentence Report notes "During the interview, [Appellant] expressed anger and hatred towards [Diana] in the current offense, which suggested that he remains a threat to her safety." This same attitude and belief was compounded by [Appellant's] own words in a presentence letter to this Court. This Court clearly considered the safety concerns of both Ms. Diana and her children in considering both the term and nature of [Appellant's] sentence.

In imposing this sentence, this Court took into consideration (1) the nature and circumstances of the offense and the history and characteristics of [Appellant], including the Pre-Sentence Report; (2) the opportunity of the Court to observe [Appellant]; (3) the findings upon

which this sentence was based; and (4) the appropriate guidelines[.]

Trial Ct. Op. at 35-37.

Appellant's claim that the trial court failed to consider his rehabilitative needs and the protection of the public is belied by the above, lengthy analysis. The court specifically considered his lack of "any remorse[ or] sorrow" for the attack on Diana, "fail[ure] to accept any responsibility whatsoever for any of his actions," and his "deflect[ion] of blame to the victim and her family." **See id.** at 36. Accordingly, we find no abuse of discretion in the court's sentence. **See Caldwell**, 2015 WL 3444594 at *2.

Finding no merit to Appellant's claims, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2015

- 17 -

# FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0003766-2012

v. : SUPERIOR COURT NO.:

WILLIAM HLUSHMANUK : 2227 EDA 2014

## OPINION OF THE TRIAL COURT

Defendant, William Hlushmanuk, appeals this Court's findings of guilt on the charges of aggravated assault[1], simple assault[2], and recklessly endangering another person (REAP)[3] at a non-jury trial held on January 6, 2014.

The defendant was sentenced to 4 to 8 years incarceration, followed by 5 years probation on the aggravated assault charge, along with other conditions[4] imposed by this Court. This sentence was ordered to run consecutive to the defendant's federal conviction and incarceration for crimes not related to or in any way factually similar to this incident[5].

CP-51-CR-0003766-2012 Comm. v. Hlushmanuk, William
Opinion

_____

[1] 18 Pa.C.S. §2702(a)(1).
[2] 18 Pa.C.S. §2701(a)(1).
[3] 18 Pa.C.S. §2705.

[4] The defendant was also sentenced to participate in anger management counseling, drug/alcohol screening and treatment programs, and undergo a mental health evaluation and receive treatment if necessary, plus court costs.

[5] For clarity, on May 2, 2014, the defendant was sentenced to 4-8 years on the aggravated assault charge, in addition to 5 years reporting probation. He was also sentenced to an additional 2 years reporting probation to run concurrent on the simple assault and REAP charges. On July 9, 2014, upon consideration of defendant's Motion Pursuant to Rule 720, this Court, *inter alia*, modified its original sentence by determining that the simple assault and REAP charges should merged with the aggravated assault charge for sentencing purposes

1

The defendant filed a timely Notice of Appeal to the Superior Court on July 24, 2014. A 1925(b) Order was issued by this Court, to which the defendant timely filed his 1925(b) Statement of Matters Complained of on Appeal on August 26, 2014.

On appeal, the defendant has raised the following four (4) issues:

"1. Whether there was insufficient evidence to support the verdict of guilty on the charges of Aggravated Assault, Simple Assault, and Recklessly Endangering Another Person when the eyewitnesses provided conflicting accounts of the alleged assault, and the credibility of the complainant, and her testimony do not support the convictions?

2. Whether the verdict was against the weight of the evidence because it fails to establish that the appellant placed the complainant in danger of serious bodily injury for purposes of Aggravated Assault and Recklessly Endangering Another Person?

3. Whether the trial court violated appellant's constitutional rights by granting the Motion of the Commonwealth to introduce prior bad act evidence at the trial, which unfairly prejudiced appellant?

4. Whether the trial court abused its discretion in imposing the state sentence in this matter to run consecutively to a federal sentence where both the complainant and appellant were federally indicted, and for which appellant commenced serving his federal sentence just prior to the imposition of the state sentence as he did not have the benefit of rehabilitation?"

The weight and sufficiency of the evidence clearly shows the Commonwealth met its burden by proving each element of the aforesaid charges beyond a reasonable doubt and this Court's findings of guilt were appropriate based upon the totality of the evidence in weight, sufficiency and credibility.

Further, for the reasons set forth herein, this Court properly admitted evidence of the defendant's prior bad acts, as said acts were similar in nature to the crimes charged, involved the same person and occurred during a nearly identical scenario, i.e., a domestic violence incident

---

and re-imposed the sentence set forth above to be served on the aggravated assault charge only. This Court's modification of its sentence structure is not subject to this appeal, except for the consecutive running of this sentence with his federal prison sentence.

involving physical contact by the defendant upon the victim, his former spouse, Jacqueline Diana.

Lastly, the defendant is currently serving a seven (7) year federal prison term for Medicare fraud. Since this other criminal activity and the instant matter are unrelated in any way, this Court imposed its sentence in this matter to run consecutive to the defendant's federal term of imprisonment. Such a sentence structure is well within the discretion of this Court and warranted under the circumstances. This defendant clearly should not be given the benefit of serving one prison term for committing two wholly separate and distinct crimes. This manner of sentence is legal, within the powers of this Court and is neither an abuse of discretion nor an error of law.

For the reasons set forth herein, the defendant's claims of error are without merit or legal basis and, therefore, it is requested that the findings of guilt on all charges, the evidentiary ruling and the manner and structure of sentence imposed be affirmed on appeal.

In summary, on October 31, 2011, at approximately 9:45 p.m., the defendant violently attacked the victim, his ex-wife, at a gas station located at Welsh Road and Roosevelt Boulevard, Philadelphia, Pennsylvania. The attack was witnessed by three independent and unrelated individuals: Philadelphia Police Lt. John Stanford[6], Rebecca McBride and Natasha Cintron. All three witnesses, as well as the victim, Ms. Diana, testified at trial. The witness testimony was consistent, in that the defendant physically attacked the victim and choked her to a point of unconsciousness. He was then observed dragging her around her vehicle and attempting to put her into a vehicle. All of this took place in front of his young daughter. The defendant was arrested at the scene by Philadelphia police.

---

[6] Lt. Stanford was promoted to his current rank in April, 2012. At the time of this incident, he held the rank of Sergeant.

The testimony presented at trial was consistent in regard to the defendant's criminal conduct against the victim on the night in question and it was sufficient to support this Court's findings of guilt. The witnesses' testimony was credible when taken both individually and was also consistent with one another when taken as a whole. Cross-examination revealed no bias, prejudice or mistake on the witnesses' part and inconsistencies, if any, were minor and without negative effect upon the overall determinations made by this Court.

At the non-jury trial of January 6, 2014, the three independent eyewitnesses testified on behalf of the Commonwealth. The first witness was Lt. John Stanford who testified as follows:

Page 22

Q. Officer Stanford, how long have you been a
Philadelphia police officer?
A. 11 years.
Q. When did you become a lieutenant?
A. In April of 2012.
Q. Okay. So what was your position, title, duty,
assigned on October 31, 2011?
A. On the date of this incident, I was a sergeant.
Q. And around 10:00 p.m. that evening, could you please
tell me what you were doing?
A. It was approximately 9:45 p.m. on the 31st. I was

Page 23

driving southbound on the nine thousand block of Roosevelt
Boulevard. It was just before Welsh and the Boulevard. I
was in the -- just for clarity, there's lanes that run
southbound. You have inner lanes and outer lanes. I was in
the middle of the outer lane traveling southbound when I
observed the defendant standing over a female choking her.
This was on the sidewalk, which was at a Sunoco Gas Station
at that location.

Page 24

Q. If you could please continue. You said you saw him
choking her and then what happened?
A. So at that point in time I had to maneuver around a

4

few cars to pull over. One of the things that moved me at that particular time was -- she had to be at least five years of age -- a little girl standing there.

THE COURT: Wait. Wait. Wait. The little girl five years of age was being choked?

THE WITNESS: No. No. No. She was standing there observing -- standing there screaming and yelling observing the defendant choking her mother.

Page 25

vehicles and made my way onto the Sunoco parking lot there. It was at that point in time as I began to exit my -- I called 911 first. As I was beginning to exit my vehicle, a 7th District lieutenant arrived on location. I was assisting her in getting the male off of the female and placing the male under arrest.

...

A. When I first observed it, he was standing -- all of this was happening on the driver's side of the vehicle. The vehicle was also parked on the Sunoco parking lot just right alongside of the pavement there. Just a few feet off of the bus stop. The defendant was standing over the female on the driver's side ground area, right on the driver's side of the vehicle. The little girl was standing just closer towards the rear of the vehicle.

I observed the defendant, what appeared to me, choking her on the ground. At that point he picked her up by her neck and began to drag her around the rear of that vehicle into the passenger's side of that vehicle. At that particular time when I was able to finally exit my vehicle

Page 26

and approach the defendant, he was straddling the female. Her body was half way into the vehicle in the passenger's side. He was straddling her and he was continuously choking her.

Q. When you say "choking," do you me two hands around her throat or one? What do you mean?

A. Two hands around her throat area.

...

A. Her body appeared limp to me. At one particular time actually, it appeared she was unconscious.

Q. Was that on the sidewalk or when she was on the passenger's side of the car?

5

A. It appeared as he was dragging her around to the rear of the vehicle, she was unconscious at that particular time. Once he actually set her up into the vehicle -- when I say "into the vehicle," she wasn't completely inside of the

Page 27

vehicle. She was unconscious or appeared to be unconscious at that point.

...

was going on. At first I thought they were like joking around. I'm looking. When I saw -- what drew my attention to it was the little girl screaming, "Get off of my mommy."
That's when I was like, This is serious and I maneuvered around the vehicle.

Page 28

A. Well, after calling 911, as I stated, after I was able to exit my vehicle and walk towards the defendant at his vehicle -- at the vehicle that they were at. It was a lieutenant from the 7th District that pulled up. She exited her vehicle and the two of us together apprehended the defendant.
Q. Okay. So to be clear, the both of you had to --
when you say get him off of her, what do you mean?
A. I physically had to pull him off of her and assisted the lieutenant in handcuffing him. She had handcuffs. Obviously I did not. I was off duty. I had to physically pull him off of her.

Page 29

Q. Do you remember about how much time elapsed from the time that you first saw the defendant choking the complainant on the sidewalk until you were able to pull the defendant off of the female?
A. I would say only a few minutes.
Q. And could you tell me did you have an opportunity to see the demeanor of the female once the defendant was pulled off of her?
A. Well, at that point as I said she appeared to be unconscious. Some other folks came over to assist. At that point I was just assisting the lieutenant in getting the defendant into a vehicle.

Q. Okay. Did you observe any injuries on the complainant?
A. I didn't look for any.

*N.T., 01-06-2014, Pgs. 22 – 29.*

On cross-examination by defense counsel, Lt. Stanford's testimony remained consistent throughout and failed to reveal any bias, prejudice or inconsistencies which would serve to discredit the weight, sufficiency or credibility of his testimony. In fact, on cross-examination, Lt. Stanford's testimony solidified the Commonwealth's evidence in regard to the charges of aggravated assault and REAP, as follows:

Page 40

A. No, sir. What I'm saying to you is once I pulled up, I observed the defendant standing over the female who was laying on the ground on the driver's side of the vehicle. He was choking her. There was a little girl standing at the rear of that vehicle screaming and yelling and crying. As I continued to maneuver my vehicle, I could still see the defendant choking her and dragging her. At that point he began to drag her towards the back of the vehicle. As I maneuvered into the Sunoco's parking lot, I kept keeping my eyes on him. As a police officer, I'm trained a little bit more than the average citizen. My concern was whether or not he had a weapon of some sort. So I continued to –

Page 42

Q. He was handcuffed. After he was handcuffed, where was the complaining witness?
A. Still laying -- or at that point falling onto the ground on the passenger's side of the vehicle.
Q. Was she conscious or unconscious?
A. Initially, she appeared to be unconscious.

*N.T., 01-06-2014, Pgs. 40 – 42.*

7

Redirect examination by the Commonwealth, further clarified the physical condition of the victim upon the arrest of the defendant.

Page 45

Q. And you said that she appeared to be unconscious. Can you describe for me what about her, other than being limp, which you've already testified to, made you believe that she was unconscious for most of this incident that you described?
A. Because her eyes were closed and she didn't have any movement.

*N.T., 01-06-2014, Pg. 45.*

Lt. Stanford's testimony was deemed both credible and reliable by this Court.

The Commonwealth next called Rebecca McBride to testify as to her observations and actions on the night of October 31, 2011. Ms. McBride testified that she:

Page 46

A. ... was just getting out of school.
Q. What were you in school for at that time?
A. EMT.
...
A. At that time I was getting out, it was right at Welsh and the Boulevard. I was pretty much walking through the Boulevard so I could cross it to catch the bus home. While I was on the opposite side of the Boulevard, that's when you could hear somebody screaming. You could see a car.

Page 47

I think it was an SUV parked on the opposite side of the corner.
Q. Okay. When you heard that screaming, what did you do?
A. Well, I was getting across the street as quick as possible.
Q. To get to the screaming?
A. Yes.

8

Page 48

Q. So you were trying to get over to where this screaming is at the SUV. Did you see anything at that point?

A. At that point parked on the curb was the car. You could see people standing back behind the car -- outside the car. And that's where you heard the commotion and that's what I saw.

Q. Okay. So what did you see exactly?

A. From that point as I got half way to the Boulevard, that's when you could see people. I did see two figures like standing out there screaming. By the time I got to the corner where it was happening, they had disappeared and they had gone to the passenger's side.

Q. Okay. At some point did you have a view of the passenger's side?

A. Yes. Once I got to that corner, this car was maybe ten feet away from me.

Q. Okay. And so what did you see?

A. Well, you saw the car door open. The passenger's side door was open. You saw the figure standing actually -- he was standing in, like right at the car door.

Page 49

Q. So what did you see that person doing?

A. At that point you saw him holding down somebody.

Q. Okay. And was that a man or a female?

A. A female.

Q. When you say holding her down, exactly what do you mean?

A. He had her pinned down. She was sitting in the passenger's seat. You saw him with his arm up holding her mouth and --

THE COURT: Ma'am, you keep saying, "You saw." We're interested in what you saw.

THE WITNESS: Yeah. From what I saw, he had his arm up and the hand blocking her mouth. His other hand was by her neck, like it was on the seat.

MR. MOZENTER: On the seat?

THE WITNESS: Yes. Yeah. It was by her neck. You could see -- at that point I wasn't right up to the car. I was still like I said 10 feet away. You saw a arm up, because you could see that through the glass, and then the other hand was, from what I saw, kind of looked like it was on the back of the seat.

9

Page 50

A. It was just nothing but screams. "Help me. Help me. Help me. He's choking me. Help me."
Q. At that point what happened?
A. I proceeded to walk towards the car.
Q. Then what happened when you started walking?
A. When I walked towards it, by the time I was a couple feet away, by that time I did see the lady go limp. You could see her eyes roll back. She was flailing and then she stopped flailing. By the time I got two feet towards the car, the police lady was right there right behind me. I saw her and I stepped out of the way and let her do what she had to do and then I went to check the lady, because like I said, I went to school -- I was in the process of becoming an EMT so I'm trained, like medically to check her breathing, check her blood pressure. I had all my stuff on me.
...
Q. And did you notice any injuries on her when you were treating her?
A. You could tell her neck was red. She had a scratch on her neck. She was hyperventilating. She was trying to,

Page 51

you know, breathe.
Q. Okay. Let's go back to when you said when she went limp and her eyes rolled back in her head and that she was flailing and then it stopped. At that point, did the screaming and any kind of speech stop as well?
A. Pretty much.
...
Q. Could you tell me exactly what the defendant did directly after the time that you noticed her go limp?
A. By that time, like I said, the cop was like right behind me and she had pulled him off. And when she had pulled him off, that's when I, you know, stepped back over to her. That's when she started becoming, you know, conscious again. You could tell she -- her eyes started blinking. She was coming to.

Page 52

Q. Did the defendant say or do anything after that female officer pulled him off the female?

10

A. Once the female officer had pulled him off, he was freaking out. He was freaking out about his phone. He lost his phone somewhere. He was in the cop's car banging on the windows saying he wanted to see his wife. He wanted to see his wife. At that point I was kind of not worried about him anymore. I was worried about her.

*N.T., 01-06-2014, Pgs. 46 -52.*

Cross-examination of Ms. McBride failed to show inconsistencies in her testimony nor did it reveal any conflicts between her testimony and the testimony of Lt. Stanford which would cause any doubt or concern with this Court.

Next, Natasha Cintron testified in the Commonwealth's case in chief. Ms. Cintron was with Ms. McBride at the time and was her fellow classmate. They were walking together to the bus stop at Welsh Road and Roosevelt Boulevard. **N.T., 01-06-2014, Pg. 58, L. 1-9, 17-21.**

As Ms. Cintron was walking toward the bus stop, she stated:

Page 58

A. There was a truck there and we heard -- there was a whole bunch of people watching the truck. We were waiting for the bus.

Page 59

A. They were behind the truck -- in the back of the truck outside. I heard screaming and then they ended up to the passenger's side of the truck and he was choking her.

Page 60

A. Like inside the car and he's in front of her. His hand was around her neck. I could only see one hand.
MR. MOZENTER: You what? I can't hear you.
THE WITNESS: I could only see one hand. His hand was around her neck.

Page 61

Q. Tell us again what you observed the defendant doing

11

just so we're clear?
A. He was standing in front of her. I only saw one hand. He was choking her. I couldn't tell if he had a weapon on the other hand.
Q. Why do you bring that up?
A. Because since there was a whole bunch of us, we didn't know if we should jump in or not. I didn't want to get hurt. I can't fight.
Q. Did you jump in at any point?
A. When he let go of her. Somebody came and stopped. Then I helped the lady, the complainant.
Q. Natasha, when you say that the defendant had one hand and was choking the lady, was he saying anything?
A. I couldn't understand what he was saying.

Page 62

THE WITNESS: I remember her arms. They were like, it looked like they were fighting, like flailing and then I remembered they just stopped. That was it. Not for long.
BY MS. RHOADS:
Q. Okay. Could you describe for me a little bit more about what the lady looked like when the defendant was pulled off of her?
A. She looked like she was hyperventilating. She was scared. She was nervous. She didn't know what to do. She had a red neck.
Q. Did you notice anything else about her physical appearance at that point?
A. Not that I remember.

*N.T., 01-06-2014, Pgs. 58 -62.*

On cross-examination, Ms. Cintron did testify that she did not see the defendant dragging the victim around the car, but thought she had walked around the vehicle.

Page 65

Q. All right. And she walked behind the truck into the car; isn't that correct?
A. To the passenger's side, yeah.
Q. Nobody dragged her there; is that correct?

12

A. From what I remember.
Q. Yeah. We don't want you to make up anything. What you remember seeing is that she physically on her own walked from the back of the vehicle to the passenger's side of the car?
A. I think so, yes.
Q. You didn't see anyone drag her there, did you?
A. I don't think I did.

*N.T., 01-06-2014, Pg. 65.*

Despite this inconsistency with the testimony of the previous witnesses, this Court did not deem it significant, as the charges stem from the choking of Ms. Diana, to which she did testify. This 'after-the-fact' testimony failed to raise any doubt in this Court's decision to find the defendant guilty for his other actions on the night in question.

There was also a stipulation between counsel that two (2) other witnesses, both police officers, if called to the stand would have testified as follows:

Page 71

MS. RHOADS: Yes. There's a stipulation by and between counsel that if Officer Black were to testify --
THE COURT: B-L-A-C-K?
MS. RHOADS: Yes. And he is present. If he were called to testify, he would testify that he responded to the location of nine thousand Roosevelt Boulevard on October 31, 2011 around 9:50 p.m. and that he observed complainant Jacqueline Diana, age 31, and she complained of pain to the neck. That there were visible injuries. The officer would testify that there

Page 72

was redness around the neck area.
...
There's also a stipulation that Detective Robert Schill would testify that he investigated this case and as part of this investigation, he took statements from Sergeant John Stanford, who testified here, Natasha Cintron, who just testified, Rebecca McBride, who also testified, and

13

[8] from the complainant, who would testify.

*N.T., 01-06-2014, Pgs. 71 -72.*

The Commonwealth's last witness, the defendant's ex-wife, Jacqueline Diana, testified not only to the events which were witnessed by the above witnesses, but also the events occurring earlier that day between her and the defendant, as well as an incident which had occurred in a similar manner and situation that had occurred on December 20, 2010. This prior incident is the subject of defendant's issue on appeal relative to his prior bad acts and is discussed hereinafter.

In regard to the events of October 31, 2011, Ms. Diana testified as follows:

Page 86

[7] A. That day, I spoke to him that day and I even invited
[8] him to go out for Halloween with us. He said that he was
[9] business and, you know, he couldn't come. So then I decided
[10] to take my oldest daughter to go trick or treating with her
[11] friends around Knights Road or somewhere. I wasn't familiar
[12] with the area. It was my first time there. He called. He
[13] was asking where we was. I picked up the phone. I wasn't
[14] being disrespectful. I told him where we are. I don't know.
[15] I tried to tell him the streets and then he showed up at the
[16] house where we were. I was already at the car.
...
[20] I was sitting in the car. I wouldn't open the door
[21] for a little while because he's, you know, yelling or
[22] whatever, cursing. I don't exactly remember if I did open
[23] the door. I know he left. But as we're driving away, he
[24] comes back. He turns around. He comes back. Makes a U turn
[25] and tells me to pull over. He wanted to talk to me, but his

Page 87

[1] demeanor says otherwise. So he's trying to run me off the
[2] road.
...
[11] A. If I'm driving, he's try to lean me towards to go to
[12] the side of the road, like he's almost going to hit me, but
[13] he's not. So, you know, I decided to call the police.

14

A. I decided to call the police to tell them, you know, that he's being aggressive towards us and I feel like we're in danger. I pulled over to like Knights Road or something at a gas station. While we're there, I still wouldn't open the door. He's yelling at me. I don't even remember half of the things he's saying. Because we're fighting so much that my oldest daughter, M█, was so upset that she started crying. She opened the door and tried to run in the middle of the street. She said she couldn't take it anymore. She

Page 88

just wants to kill herself because we continue to fight this way.

So he runs after her in the middle of the street. While he's holding her, he's siting there saying, I'm going to F'ing kill you. So we get back in the car.

Q. Who's "we" exactly?

A. Me, M█, and now Bill is in the car. But before he actually got into the car, he actually broke my car door because he was trying so hard to open the door. I wouldn't open the door until the police officers got there. So when the police officers got there, he makes up this lie to where he says I don't let him see the girls and this and that. When in truth, that's not the case. I've been trying.

Q. I just want to be clear. This incident that you're still talking about with the door handle and the car, that's still at a location where you guys were trick or treating?

A. Yeah. It's near there still.

Q. So when the police come, do you speak with the officers?

A. Yes. I explained to them, but basically since I didn't have a protective order, they couldn't do anything. They sent me my way and they sent him his way. We're just going home. Even on the drive home, he's still behind us. He's like, you know, on me, arguing with me.

Page 89

A. Like, he's still behind me and following me. He's still urging me to pull over.

Q. At any point, did he call you or is this all just via the cars?

A. I think we were on the phone. I finally pulled over. I pulled over. This time it was Welsh and the

15

Boulevard or Grant and the Boulevard. It's a gas station. I pulled up right there. Now my daughter's window is cracked open maybe like this much. So that was his way of getting into the car, because I didn't want to open the door again. When he got into the car, he was holding her and he was hugging her, but then he grabbed the keys out of the ignition and said, "I'm never letting you go home. Do you hear me right now? You're not going home." So when he did that, I grabbed my cell phone and I tried to call the police again. I don't know which way he went. All I know is I dropped the phone. I'm trying to shuffle with it. He's behind me now in a choke hold. Now I can't breathe. I can't scream. I can't do nothing. I'm trying to get the people's attention at the bus stop, because there's a bus stop right there, to help me.

THE COURT: Are you out of the car at this point?

THE WITNESS: Yes. At that time I had an Escalade so it's a pretty long car. So from the

Page 90

beginning of the car, all the way to the back, he's dragging me. He's not even dragging me anymore. I'm in the air. I'm choking. I can't breathe. All I could hear -- I just focused on M●'s voice and she's screaming for me. I don't even remember if he's saying anything to me. He just trying to make me, like stop jumping around and screaming. So finally I completely passed out. I don't remember anymore. I just saw black. That's it. Then I wake up and I'm on the ground and he's rubbing my chest and he's rubbing my back. You know, of course my daughter is screaming her eyes out. And then after that, I see like everybody coming near us. So he tried to grab me, like he's kissing me to make it look like we're, you know --

MR. MOZENTER: Objection to "make it look like."

THE COURT: Sustained.

...

Q. Let me ask you this: When you come to and he's rubbing your chest and back, where are you at this point?

A. I'm probably like a car away from my car, like all the way in the back.

Q. Okay. So your near the rear of your car?

A. Yeah.

16

Q. On the ground or --

Page 91

A. On the ground.

Q. And at that point, you say he grabbed you how?

A. He tried to pretend like he's kissing me.

Q. Just tell me specifically what he did?

A. He grabbed me by my head. He grabbed me by my face because now I got to. I'm screaming now. I'm like, "Help. Help. Help. Someone help me." And he dragged me back into the car. So now I'm sitting on the passenger's side like on the floor of my car. He's trying to calm me down because now he's panicking. Everybody is coming, you know, and then he's still like face-to-face to me like this trying to shut me up and that's when the cops came and put handcuffs on him.

Q. How did you get from the rear of your vehicle to the passenger's side? He carried you?

A. He didn't carry me. He just dragged me.

...

Q. Exactly how did you get back to the passenger's side?

A. He dragged me there.

Q. And where were his hands or arms when he dragged

Page 92

you?

A. They were on my head, like they were on my face. He's pretending he's kissing me, but we're not.

Q. When you're in the car, could you describe how you felt in the car physically?

A. I don't really remember physically. All I know is that I was just knocked out. He really could have killed me. He meant to kill me.

Q. Okay. And, Jacqueline, when you're in the car, you said that you blacked out. Were you unconscious when you're in the passenger's side as well?

A. No.

Q. Not that you remember?

A. No. No.

Q. Do you remember at any point if you were fighting the defendant? Like were you ever flailing your arms?

A. I was. When he was trying to choked me, like when he had me from the back.

17

Page 93

Q. Okay. And, Jacqueline, did you have any injuries as a result of this?

A. Just my neck was very swore. That's it. I didn't go to the hospital. I just wanted to get home.

...

Q. Other than the soreness or redness on your neck, did you have any other problems after that incident physically?

A. No. Well, just for a few days I was probably swore. I couldn't swallow. Other than that, I was fine.

Q. When you say "swore," exactly where on your body were you swore?

A. My throat.

Q. Okay. Do you remember speaking with females at the actual sight of the gas station after this?

Page 94

A. I spoke to -- they were actually students at the time that were EMTs. When they placed him in the police car, they were just checking to see if I was okay, like my neck, my heart rate and whatever.

*N.T., 01-06-2014, Pgs. 86-94.*

Cross-examination, although intensive and specific to the details on the night of this assault, failed to elicit any exculpatory or justification testimony. Ms. Diana remained consistent throughout, was deemed credible by this Court and her testimony further supported the findings of guilt. On cross-examination, Ms. Diana stated:

Page 94

A. Right now we're separated. We're not divorced.

Q. Okay. And you were also partners with him in business; isn't that correct?

A. Not really.

Q. Well, you worked for him, right?

A. Yes.

Q. And you're under indictment, aren't you?

A. Yes.

Q. For stealing a couple of million dollars from the

federal government as a result of this ambulance business

Page 95

that you and your husband were in, right?

A. Right.

Q. And your husband is serving 8 years in a penitentiary as a result of that; is that correct?

A. I'm actually on home arrest right now for that as well.

Q. That's because you cooperated with the federal government?

A. Absolutely. I wasn't going to lie.

Q. Okay. So you cooperated with the government because you didn't want to go to jail?

A. Absolutely. I have two children to take care of.

Page 105

Q. Why did you pull into the Sunoco Station?

A. Yes. He told me he's calm now. He said he was going to be nice. He just wants to talk. I said fine, you know. I pulled over to Welsh and the Boulevard to try to speak to him. But at the time, I didn't want to open the door yet until I knew that his demeanor was okay. So inside of that, he slid the window open and he just reached in and

Page 106

opened the door.

Page 107

Q. Now, you got to -- and at that time, did you call --
when he was following you, did you call 911?

A. No, not yet because he was promising me that he was going to be nice. He was going to calm down. He just wanted to talk to me and M● and that's it.

Q. Okay.

A. And he was just going to let me go home.

Q. And then you pulled over to the Sunoco Station?

Page 108

A. Right.

Q. He got out of his car and you let him in your car?

A. No. I didn't let him in my car. I wouldn't let him in at first because I wanted to make sure that his demeanor was normal. Since I would'nt open the car, he just reached in through the cracked window from the passenger's side and opened the car door.

Q. I see. All right. Does he get in the car now?
A. Yes. He gets in the car.
Q. In the passenger's side?
A. On the passenger's side with my daughter.
Q. The daughter was on the passenger's side?
A. Yes.
Q. Okay. So, was the daughter in the front of the car?
A. Yes.
Q. What happened to the daughter? Did she get out of the car? Did he remove her from the front seat?
A. No. No. She was really upset, distraught.
Q. Physically, where was your daughter when he got in the car?
A. Physically, she was sitting on the passenger's [seat].

Page 109

Q. As a matter of fact, he never hit you with his fist at any time, did he?
A. No.
Q. Did the argument continue when he got into the car at the Sunoco Station?
A. At first it wasn't. He was just talking to my daughter and then he saw the car -- the car keys were still in the ignition. He pulled it out and said, "You're not going home. I'm not letting you go home this time."

Page 110

Q. Okay. Now, while he's in the front seat with his child, did you leave the car? Did you get out of the car?
A. I was just sitting there. I'm still frightened. Because our conversations go like this, if I don't pick up the phone, or if I don't answer his calls, he would threaten me or if he sees me, he would try to choke me. He never hits me. His main thing to hurt me is by choking me.
Q. When he got into the car with your child, did he choke you at that time?
A. No. He just grabbed the key and he --

20

Q. Did he strike you at that time?
A. No.

Page 111

A. And threatened that he was not going to let me go home. He always threatens me that he's going to hurt me. That's why I freaked out. I jumped out of the car and I tried to call the police.
Q. When you jumped out of the car, did you run?
A. No. I was just trying to call.
Q. And did you call when you jumped out of the car?
A. No, because he got behind me already or whatever. The phone flew off and he was already choking me from behind.
Q. With what hand did he choke you?
A. It was a choke hold.
Q. Show us.
A. I don't exactly remember. I know a choke hold is like this. So he has me like this.
MS. RHOADS: For the record, the complaining witness is lifting both arms up and wrapping one arm in front of the other one and pulling.

...

Q. Show us again where his position was?
A. It's a choke hold. I had my neck right here. I can't breathe.
Q. But he didn't put two hands around your neck and squeeze you?
A. No.

Page 112

Q. He never wrapped his hands around your neck and choked you?
A. No.
Q. Did you break away from him at any point?
A. No, I couldn't.
Q. Did you fight back?
A. I couldn't fight back. I'm up in the air.
Q. And then what happened?
A. Nothing. All I could do is try to scream. I was trying to scream for help from the people at the bus stop.
Q. And there were a lot of people at the bus stop?
A. There were a lot of people.

21

Q. Did you get back into the vehicle?

A. No, not yet.

Q. How did you get back into the vehicle?

A. When I woke up from blacking out, I was on the ground. He had me sitting up and he was rubbing my back and my chest.

Page 113

Q. And you said it looked like he was trying to kiss you; is that right?

A. When I started to freak out and realize, like, Oh, my God. I actually blacked out. That's when I started screaming at the top of my lungs for help.

Q. Do you have any physical condition that would cause you to hyperventilate at times? Strike that. Did you ever hyperventilate prior to this accident?

A. Not exactly.

Q. What do you mean by, "not exactly?"

A. I mean, I only do that when I'm in complete anxiety.

Q. And were you in complete anxiety?

A. Absolutely. I'm in terror.

*N.T., 01-06-2014, Pgs. 94-113.*

In order to fully clarify the record and this Court's understanding of the facts, given the extensive nature of Ms. Diana's testimony, the chaos of that night in question and the manner in which the testimony was presented, it was necessary for this Court to briefly question this witness as follows:

Page 120

THE COURT: All right. When you got out of the car to make a phone call, that's when you indicated that the defendant came up from behind you and did what you called a choker hold on you?

THE WITNESS: Yes.

THE COURT: Is that when you passed out?

THE WITNESS: I didn't pass out for a little bit. I tried to hold on to try to scream for help. I don't remember exactly when I passed out.

THE COURT: Do you know how you got to the

22

ground?

THE WITNESS: No.

THE COURT: And do you know what happened to you while you were on the ground?

THE WITNESS: No. Just when I woke up, I was sitting up.

*N.T., 01-06-2014, Pgs. 120.*

Despite the overwhelming testimony as to the violent nature of the acts committed upon the victim by the defendant, the defense focused upon the Commonwealth's alleged failure to prove that the defendant's estranged wife was in danger of death or serious bodily injury, and, therefore, the defendant could not have been convicted of either aggravated assault or REAP.

The defendant's argument fails on both counts, as the testimony of the victim and the several eyewitnesses' testimony had satisfactorily proven that the defendant perpetrated the violent act of choking the victim to a point of unconsciousness and which could have resulted in serious injury to her. Neither REAP nor aggravated assault require that the victim actually suffer a serious injury, but only be faced with the risk of such as a result of the defendant's criminal conduct.

A person is guilty of simple assault if he attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another. 18 Pa.C.S. §2701(a)(1). A person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. 18 Pa.C.S. §2702(a)(1).

Reckless endangerment is defined as "recklessly engag[ing] in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705. Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function

23

of any bodily member or organ" and the term "bodily injury" relates to an "impairment of physical condition or substantial pain." 18 Pa.C.S. § 2301.

The victim clearly sustained bodily injury and an impairment of a physical condition, i.e., loss of consciousness, when she was choked by the defendant's intentional and reckless acts. Based upon the evidence adduced at trial, this Court determined that the Commonwealth had met its burden of proving each of the elements of these crimes sufficiently in order to support the findings of guilt on all charges.

In order to "sustain a conviction under Section 2705, the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created." *Commonwealth v. Cordoba*, 902 A.2d 1280, 1288 (Pa. Super. 2006) (citing *Commonwealth v. Hopkins*, 747 A.2d 910, 915-16 (Pa. Super.2000)). "[T]he mere fact that the victim only sustained minor injuries and did not sustain 'serious bodily injury' does not[,] ipso facto[,] establish that appellant's actions did not place others in danger of such injury [pursuant to a REAP charge]." *Commonwealth v. Lawton*, 414 A.2d 658, 663 (Pa.Super. 1979).

In the present case, defendant claimed that because the victim did not receive medical care as a result of his violent acts, he could not be convicted of either REAP or aggravated assault since she did not sustain what would be considered a serious injury. In reaching this conclusion, the defendant would have this Court totally dismiss the testimony of the victim and three (3) eyewitnesses who all testified that the victim was choked by the defendant, had lost consciousness and caused her body to go limp. The need for medical attention is not an element of the crime required for conviction.

This Court acknowledges that the injuries ultimately sustained by the victim were

apparently minor, but this does not negate the fact that the defendant's violent actions upon the victim at the time of the assault placed her in danger of serious bodily injury, inasmuch as the outcome could have been devastating. Choking a person into unconsciousness places one in danger of serious injury. The defendant's acts gave rise to the potential to have caused serious injuries, but for the intervention of the police and witnesses.

The quality of injury actually sustained by a victim is not determinative in this context. *See Lawton, supra.* Rather, it is the assailant's potential, or "actual present ability," to inflict serious bodily injury, that controls the situation. *See Cordoba, supra.* The fact that the victim did not ultimately "suffer serious bodily injury" does not negate a finding of guilt on REAP or aggravated assault charges.

In *Lawton*, the Superior Court determined that an unarmed man committed REAP when he threatened several people in a crowded Philadelphia subway station, and then "started swinging [punches] indiscriminately into a crowd of students." *Lawton*, 414 A.2d at 662. The panel in *Lawton* discussed Section 2705 and sufficiency of the evidence, as follows:

> Reckless endangerment is defined in 18 Pa.C.S. § 2705 as "conduct which places or may place another person in danger of death or serious bodily injury." Section 2705 is derived from section 211.2 of the Model Penal Code. The commentary to the Model Penal Code provides that section establishes a general prohibition of recklessly engaging in conduct which places or may place another person in danger of death or serious bodily injury. It does not require any particular person to be actually placed in danger, but deals with potential risks, as well as cases where a specific person actually is within the zone of danger.
>
> Relying upon this standard, we concluded that "while appellant may have only struck the victim and another unidentified individual, his action of swinging indiscriminately into a crowd of students was sufficient to establish beyond a reasonable doubt that he may have placed other persons in danger of serious bodily injury." [Internal citations omitted.]

While there is no allegation in the instant case that the defendant's acts placed anyone but the victim herself in immediate danger, *Lawton* stands for the general proposition that a victim

25

of REAP, who is also an assault victim, need not actually sustain "serious bodily injury" in order for a defendant's underlying conviction to be upheld. Moreover, the assailant in *Lawton* was found to have committed REAP on the basis of nothing more than swinging his fists, with no apparent target selected in advance. Here, by contrast, the trial evidence showed that the defendant specifically and successfully targeted Ms. Diana with his violent actions.

With respect to the merits of defendant's challenge to the sufficiency evidence, it should be noted that the evidence presented by the Commonwealth suggested that the defendant did not merely attack the victim, but choked her until she lost consciousness. This testimony was also sufficient for this Court to conclude that defendant committed an aggravated assault upon Ms. Diana. With that, the defendant also committed a simple assault as well.

Additionally, the loss consciousness at the defendant's hands and sustained directly from the defendant's assault clearly demonstrates that the defendant possessed an actual ability to inflict physical harm upon her, and not merely a theoretical ability to do so. Taking into account testimony that the defendant is trained in karate and holds a black belt, further compounded his ability to inflict harm when such training is employed in criminal activity. *N.T., 01-06-2014, Pgs. 112, L. 2-7.*

Moreover, defendant's assault upon Ms. Diana was directed at her head and neck region and caused the victim to lose consciousness. See *Commonwealth v. Alexander*, 383 A.2d 887, 889 (Pa. 1978) ("[T]here can be no dispute about the physiological significance of the head."). An attack upon the head area cannot be assumed to carry only a *de minimis* risk of serious bodily injury. See *Commonwealth v. Burton*, 2 A.3d 598, 605 (Pa. Super. 2010) (en banc) (upholding assailant's conviction for aggravated assault upon basis of a single punch, that placed "victim . . . in real danger of dying").

26

Therefore, based upon the foregoing discussion, this Court concluded that there was sufficient evidence to determine that defendant had committed REAP, aggravated and simple assault upon the victim in this case and the convictions were properly supported by the evidence, as the Commonwealth proved each element of the respective crimes beyond a reasonable doubt.

Defendant's next issue challenges this Court's decision to permit the Commonwealth to introduce in its case-in-chief testimony from the victim of an earlier physical assault by the defendant upon her on December 20, 2010. This episode involved a nearly identical situation where the defendant allegedly choked the victim and slammed her to the ground during a domestic dispute thereby, qualifying as a "prior bad act" under Pa.R.E. 404(b).

The appellate standard of review applicable to an issue contesting the admissibility of evidence is abuse of discretion. *Commonwealth v. Rosen*, 2012 WL 1415771 (Pa. 2012). An abuse of discretion is not merely an error in judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. *Commonwealth v. Harris*, 884 A.2d 920 (Pa. Super. 2005), *appeal denied*, 928 A.2d 1289 (Pa. 2007). A discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion. *Commonwealth v. Lomax*, 8 A.3d 1264 (Pa. Super. 2010).

This discretionary ruling on the admissibility of the defendant's prior bad act falls directly within the requirements for admissibility as set forth in Pa.R.E. 404(b), which states:

(b) Other crimes, wrongs, or acts.

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

27

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

(4) In criminal cases, the prosecution shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. Pa. R.E. 404(b).

As the Rule indicates, generally "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa. R.E. 404(b)(1). However, there are many exceptions to this Rule.

Generally, evidence of other crimes is independently admissible in a trial for a distinct crime to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) identity, where there is such a logical connection between the crimes that proof of the extraneous crime naturally tends to show that the accused committed the crime with which he is charged *Commonwealth v. Nahavandian*, 849 A.2d 1221 (Pa. Super. 2004), *re-argument denied, appeal granted, vacated on other grounds*, 888 A.2d 815 (Pa. 2006).

This Court determined that the "prior bad acts" evidence that the Commonwealth wished to introduce in its case-in-chief, that is the defendant's previous assault upon his ex-wife, was relevant and admissible under Pa. R.E. 404(b) to show Defendant's motive, malice and intent. *Commonwealth v. Nahavandian, supra.*

In this regard, Ms. Diana testified:

Page 74

Q. Okay. At what point did this relationship end?
A. In 2010, we had a really big fight and that's when I decided to leave.
. . .

28

Q. Jacqueline, are you talking about December 20, 2010?
A. Yes.
Q. So could you tell me about what happened on that date?

Page 75

A. Okay. He hadn't been home for the whole weekend, which was about three days. I couldn't get in contact with him. He wouldn't call me back. I left him a message. I went back to Northeast Philadelphia to stay with my parents. I left him a message. I said we're going to go Christmas shopping with the girls and I'll just come home when I take M█ to school in the morning, which is going to be a Monday. I didn't hear from him until like after midnight, which was around 1 o'clock in the morning. He called and he's like, "No, you're coming home." He starts cursing me out.
He said, "Even if I have to come in there and drag you out."

...

Q. You could continue with what you were saying.
A. He said he was going to drag me out of the house and he's going to come pick us up. I said don't do that because my parents don't want you here anymore because every time you

Page 76

would come, we could fight. So, a few minutes later, he's at the door. I'm still on the phone with him. He said he was knocking on the door, but it sounded like he was kicking the door in.

Page 78

Q. Did you hear the defendant say anything in English to his father?
A. He did. He told him to go home and let him handle his family business. That's what he said.
Q. What's the next thing that happened after you heard that?
A. When I heard him say that, I ran outside. My

Page 79

parents tried to stop me because the cops weren't there yet.

29

So while I was running, in midair -- I'm trying to scream for him. I'm jumping up and down, he grabs me --

Q. Who were you trying to scream for?

A. For his dad.

Q. Okay. So his dad had actually come to the location?

A. Yes.

Q. So you saw his dad at your parent's house and you were screaming for him to stop?

A. Yes, because he was driving away.

Q. Okay.

A. So I said, "Dad, please stop. Come back." And while I was doing that, he grabbed my neck in midair and body slammed me on the ground.

Page 80

Q. What part of your body did he grab?

A. My neck.

Q. Did he grab you with one hand or two hands?

A. I don't remember.

Q. You said he body slammed you?

A. Yes.

Q. Did your body make contact with the ground?

A. Absolutely.

Q. What happened after your body made contact with the the ground?

A. I couldn't breathe. My chest really hurt. I thought I probably broke a rib or something. Then my dad came outside

Page 81

When you were on the ground, did the defendant do anything to you?

A. Yes. He was on top of me. I don't remember exactly what he was saying. I know that it was something like whether I like to or not, that I was coming back home with him and with the kids.

Q. Where were his hands?

A. I don't even remember. I don't remember. All I know is that I'm on the ground and I can't breathe.

Q. How did that come to an end where he had you on the ground?

A. My dad pushed him off of me and then I saw his dad try to help out as well. ...

30

Q. Okay. So how did eventually that stop?

A. Me and my dad went ahead inside while his dad was trying to stop him and calm him down.

Q. Jacqueline, I want to go back. You're on the ground

Page 82

and you said that you couldn't breathe. You said that you were dazed and you couldn't really see. Can you tell me if something happened to your vision while you were on the ground or do you remember anything specifically like that?

A. I don't think so. It was probably because I was in shock and with just being slammed on the ground.

Q. Did your head hit the ground?

A. Yes.

Q. Did you receive any medical treatment?

A. I didn't go to the hospital right away. My first instinct was to just get away as fast as I can because he would not leave. Like the police finally came. They told him he has to leave, but he wouldn't leave. He kept coming back. I just grabbed the children just for our safety and just got out of there.

Page 85

Q. Ms. Diana, would it be fair to say that you never went to court against Mr. Hlhusmanuk or against Bill?

A. To be honest, I didn't want to press charges on him. I just wanted him to stop and leave me alone and we'll go through a divorce and do all of that the correct way. He didn't want to do that. He would keep, you know, trying to hurt me or whatever the case may be. I just wanted to be left alone.

Q. What was the state of your relationship up until October 31, 2011 after this incident that we just discussed in December?

A. I did place -- what you call that --

Q. Just don't tell me details. Just the nature of it. Can you just describe it?

A. It wasn't very good. I tried very hard to be as understanding or nice or I would even still take his phone calls and talk to him or even agree to see him with the girls even though I knew that, you know, I'm in risk of having him, you know, hurt me. Since he refuses to try to want to see the girls or have a schedule or something. He doesn't want to go to the police district and met up with me. He would

31

just show up in school. If he sees me down the road, he

Page 86

would drive me off the road and try to speak to me.

*N.T., 01-06-2014, Pgs. 74 -86.*

Cross-examination on this prior incident confirmed its violent nature and extent of abuse. Ms. Diana sought medical treatment for injuries to her ribs as a result of her being slammed to the ground. Clearly, this evidence shows the violent propensity of the defendant towards Ms. Diana, the acting out on those propensities and her sustaining injury.

Page 97

Q. I'm asking whether or not you personally went to the hospital for any physical injuries that allegedly occurred on this incident back in 2010?
A. I did.
Q. Yet, the police said to you that they couldn't arrest --
A. What happened was, the first time they told me that they couldn't arrest him, that's fine and --
THE COURT: When you say "the first time," you mean after the 2010 incident?
THE WITNESS: Yes. So at that time they told me that they couldn't arrest him even though he did all those things. They weren't there. They didn't see what happened. The next day I really thought that I broke a

Page 98

rib so that's when I went that morning. It was at 2 o'clock in the morning. I went to Jefferson to check myself in to just check to see if I'm okay. I was just bruised. I didn't break any ribs or anything.
So they took another police report and I told them exactly what happened because that police report from my house and the police report I gave at the hospital, were two different reports.
THE COURT: Okay.
BY MR. MOZENTER:
Q. Well, where is that report?

32

THE COURT: Which report?

MR. MOZENTER: I don't know. The second report. I only have one.

BY MR. MOZENTER:

Q. Regardless, between 2010 and 2011, you were not living with the defendant?

A. No.

Q. But you were still working at that business that you two had?

A. No.

Q. That was over?

A. That was over.

*N.T., 01-06-2014, Pgs. 97-98.*

This Court concluded that the above testimony was sufficient evidence to demonstrate long standing physical and mental abuse and malice towards Ms. Diana. See *Commonwealth v. Liliock*, 740 A.2d 237, 244 (Pa. Super. 1999), *appeal denied*, 795 A.2d 972 (Pa. 2000), *post-conviction relief denied*, 2002 WL 34400883 (West. 2002), *aff'd*, 833 A.2d 1147 (Pa. 2003), *appeal denied*, 847 A.2d 1281 (Pa. 2004) (prior relations between the defendant and a victim may be relevant to show intent or malice).

It also showed the defendant's repeated and continued efforts to threaten, intimidate and physically harm the victim. See *Commonwealth v. Claypool*, 495 A.2d 176 (Pa. 1985) (evidence of defendant's statement regarding his prior criminal activity, which he made to threaten and intimidate the victim, was admissible when force or threat of harm is an element of the crime for which he is standing trial); and as a part of the *res gestae*.

The introduction at trial in the Commonwealth's case-in-chief evidence of prior charged or uncharged physical abuse perpetrated by an accused upon the complainant to prove one of the lawful purposes for which such evidence is authorized under Pa.R.E. 404(b)(2) was also proper. See *Commonwealth v. Sherwood*, 982 A.2d 483 (Pa. 2009), *cert, denied, Sherwood v. Pennsylvania*, 130 S.Ct. 2415 (U.S. Pa. 2010), *habeas corpus dismissed, Sherwood v. Beard*,

2011 WL 6888653 (M.D. Pa. 2011) (evidence of defendant's prior physical assaults upon four year-old victim was admissible to show intent, lack of mistake, ill-will, and malice, in prosecution for first degree murder.); *Commonwealth v. Drumheller*, 808 A.2d 893 (Pa. 2002), *reargument denied, cert. denied, Drumheller v. Pennsylvania*, 123 S.Ct. 2284 (U.S. Pa. 2003) (evidence of prior acts of abuse admissible to show the sequence of events that formed the case and demonstrates defendant's motive, malice, intent and ill-will toward the victim); *Commonwealth v. Chandler*, 721 A.2d 1040 (Pa. 1998) (abusive domestic relations between defendant and homicide victim admissible to show malice); *Commonwealth v. Lilliock*, 740 A.2d 237 (Pa. Super. 1999), *appeal' denied*, 795 A.2d 972 (Pa. 2000), *post-conviction relief denied*, 2002 WL 34400883 (West. 2002), *aff'd*, 833 A.2d 1147 (Pa. Super. 2003), *appeal denied*, 847 A.2d 1281 (Pa. 2004) (prior protective orders between victim and defendant admissible to show intent or malice); *Commonwealth v. Odum*, 584 A.2d 953 (Pa. Super. 1990) (defendant's abusive relationship with the deceased, an elderly aunt, over a ten-year period was admissible during his trial for her murder).

Thus, evidence that the defendant had previously assaulted and committed physical violence upon his estranged wife by choking her previously to the night in question was relevant and probative of defendant's motive and intent for committing the assaults upon his ex-wife.

The factual basis of the present charges against this defendant indicated that he became violently aggressive towards her, choking until the point of lost consciousness. Evidence that the defendant had previously engaged in the same behavior with Ms. Diana was relevant and admissible as it was closely linked in similarity and nature to the charged offenses. This degree of similarity is an important factor in determining the admissibility of other crimes or bad acts as relevant to show a common scheme or plan. *Commonwealth v. Einhorn*, 911 A.2d 960

34

(Pa.Super. 2006), *appeal denied*, 920 A.2d 831 (Pa. 2007).

Here, this Court concluded that the Commonwealth's evidence of defendant's December 20, 2010 assault upon Ms. Diana was admissible as evidence of a common plan, scheme or design to injure, intimidate, place in fear and control her. In both incidents, the defendant grabbed Ms. Diana by the neck and choked her. It was reasonable for this Court to infer that both incidents were precipitated and induced by defendant's desire to place and keep the victim in a constant state of fear and intimidation. This Court's ruling on the Commonwealth's evidence of defendant's prior choking of Ms. Diana was admissible as a prior bad act under Pa.R.E. 404(b) and was, therefore, not an abuse of discretion.

Lastly, the defendant claims that this Court's sentencing structure is also an abuse of discretion since he is required to serve his sentence for these violent crimes subsequent to him serving a federal sentence for fraud. Since the crimes are wholly separate and apart from each other, the sentences themselves should be separate and apart as well. The defendant believes he is entitled to a concurrent sentence structure, but provided no support for this request. He simply desires to have the benefit of concurrent confinement. Such relief is not warranted.

By history, the Presentence report revealed that this defendant has had numerous contacts with the Court, making him RRRI ineligible. Given the grading of the aggravated assault charge as an F-1, the Offense Gravity Score was a ten (10) and his Prior Record Score was a four (4).

The Sentencing Guidelines recommended a sentence of 48 to 66 months (+/- 12 months). The Commonwealth recommended incarceration of 4 to 8 years incarceration, plus ten (10) years of reporting probation, in addition to other conditions. Defendant's counsel suggested a mitigated sentence of 3 to 6 years.

This Court imposed a sentence of 4 to 8 years incarceration, plus 5 years probation on the

35

aggravated assault charge. Confinement was ordered to run consecutive to his federal prison term. The sentence imposed is well below the maximum sentence for a felony of the first degree of not more than twenty (20) years confinement.

To further support the imposition of a consecutive sentence, at his sentencing hearing, the defendant exercised his right of allocution. At no point during this address to the Court did he show any remorse, sorrow or any semblance of humanity. There was no apology to the victim, the mother of his children. There was no apology to members of his family. Instead, the defendant deflected blame to the victim and her family. He failed to accept any responsibility whatsoever for any of his actions.

In fact, the Presentence Report notes "During the interview, the defendant expressed anger and hatred towards [Ms. Diana] in the current offense, which suggested that he remains a threat to her safety." This same attitude and belief was compounded by the defendant's own words in a presentence letter to this Court. This Court clearly considered the safety concerns of both Ms. Diana and her children in considering both the term and nature of the defendant's sentence.

In imposing this sentence, this Court took into consideration (1) the nature and circumstances of the offense and the history and characteristics of the Defendant, including the Pre-Sentence Report; (2) the opportunity of the Court to observe this Defendant; (3) the findings upon which this sentence was based; and (4) the appropriate guidelines per *Commonwealth v. Coulverson*, 2011 Pa. Super. 255, 317, 34 A.3d 135, 143-144 (Pa. Super. 2011).

Within the constraints of the Sentencing Code, a trial court has broad discretion to fashion a sentence consistent with the need for protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. *Commonwealth v. Mouzon*, 571 Pa. 419,

423, 812 A.2d 617, 620 (2002). The sentence imposed upon this defendant falls well within this Court's discretion and is neither excessive nor unreasonable under the circumstances. Clearly, the sentence imposed upon this defendant took into consideration all of the above factors.

Therefore, for the foregoing reasons, this Court's findings of guilt, evidentiary rulings and imposed sentence should be affirmed on appeal.

BY THE COURT:

_____ J.
ANGELO J. FOGLIETTA

Date: January 29th, 2015

37

COMMONWEALTH vs. WILLIAM HLUSHMANUK

CP-51-CR- 0003766 -2012

SUPERIOR COURT NO.: 2227 EDA 2014

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Opinion upon the person(s),

And in the manner indicated below, which satisfies the requirements of Pa. R. Crim. P. 114:

## COUNSEL:

Hugh J. Burns, Jr., Esquire
Chief, Appeals Unit
Three South Penn Square
Philadelphia District Attorney's Office
Philadelphia, PA 19107

Erin Lentz-McMahon, Esq.
21 West Airy Street
Norristown, PA 19401
Attorney for William Hlushmanuk

Susan Cho, Esq.
Assistant District Attorney
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

TYPE OF SERVICE: FIRST CLASS MAIL

DATED: January 29TH, 2015

ANGELO FOGLIETTA